24 F.3d 271
 64 Fair Empl.Prac.Cas. (BNA) 1328, 306
U.S.App.D.C. 265
FLORIDA STATE CONFERENCE OF BRANCHES OF the NAACP, and the
Marion County Branch of the NAACP, Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee.
Pasco Pinellas Broadcasting Company, Intervenor.
 No. 93-1162.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 18, 1994.
Decided May 27, 1994.
 
 Appeal of an Order of the Federal Communications Commission.
 David Honig, argued the cause for appellants. With him on the briefs were Dennis Courtland, Gen. Counsel, and Everal Thompson, Associate Gen. Counsel, National Association for the Advancement of Colored People.
 David Silberman, Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were William E. Kennard, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, Federal Communications Commission.
 On the brief for intervenor Pasco Pinellas Broadcasting Co. were Dennis F. Begley and Andrew S. Kersting.
 Before: SILBERMAN, WILLIAMS, and GINSBURG, Circuit Judges.
 Opinion for the Court filed by SILBERMAN, Circuit Judge.
 SILBERMAN, Circuit Judge:
 
 
 1
 Two Florida NAACP organizations petition[1] for review of the FCC's renewal of radio licenses to Pasco Pinellas Broadcasting Company. Although the Commission imposed a forfeiture of $18,000 on the company and granted only a short-term renewal because of the licensee's inadequate compliance with the FCC's Equal Employment Opportunity program requirements, it determined that a hearing sought by the NAACP was unnecessary. We affirm.
 
 I.
 
 2
 The FCC's EEO rule prohibits broadcast licensees from engaging in racial discrimination in employment, see 47 C.F.R. Sec. 73.2080(a) (1993), and obliges them to adopt an EEO program that includes various efforts to attract minority employees such as contacting minority organizations wherever job vacancies exist. See 47 C.F.R. Sec. 73.2080(c)(2) (1993). The Commission's rationale for banning employment discrimination is that it goes to the character of the licensee. See National Org. for Women, New York City Chapter v. FCC, 555 F.2d 1002, 1017 (D.C.Cir.1977). The requirement that licensees engage in affirmative efforts to recruit minorities is predicated on the diversity of programming rationale upheld in Metro Broadcasting, Inc. v. FCC, 497 U.S. 547, 554-55, 110 S.Ct. 2997, 3003-04, 111 L.Ed.2d 445 (1990). The Commission's EEO program does not, however, purport to require a licensee to achieve numerical goals of minority employment as do certain government "affirmative action plans." See, e.g., Contractor's Ass'n of Eastern Philadelphia v. Shultz, 442 F.2d 159, 163 (3d Cir.1971) (construing Secretary of Labor's regulations implementing Executive Order 11,246).
 
 
 3
 Pasco operates two radio stations, WLVU(AM) and WLVU-FM, both of which it acquired in February 1986. The stations are located in a rural section of the Tampa-St. Petersburg-Clearwater Metropolitan Statistical Area (Tampa MSA), in which minorities constitute 15.2% of the population. Employment reports filed by Pasco with the FCC in 1987 and 1988, see 47 C.F.R. Sec. 73.3612 (1993) (requiring annual employment reports), showed that in those years the stations had 15 and 16 full-time employees, respectively, none of whom was a minority.
 
 
 4
 When Pasco applied to renew its licenses in 1988, it was faced with opposition from petitioners who urged the Commission to deny renewal because Pasco allegedly had not complied with the Commission's EEO rule. Pasco had hired 19 full-time employees in the previous year, all of whom were white. Contending that the licensee lacked a "meaningful" EEO program, petitioners argued that the Commission should conduct a further investigation or hearing[2] before extending the licenses.
 
 
 5
 Pasco sought to excuse its employment record by explaining that it encountered difficulties in attracting minority applicants. The bulk of the minorities within the MSA lived 25 miles away in the Tampa-St. Petersburg environs, separated from the station by inadequate highways and a lack of public transportation. The company's salaries, moreover, were said to be significantly lower than stations in the urban area, so it was difficult to attract anyone from those areas given the long and difficult commute. The minority population close to the station, which was more in the range of 3-5%, was largely involved in agricultural work and therefore, according to Pasco, unavailable for employment at the station.
 
 
 6
 The Commission, concluding that further investigation was necessary, asked the company to provide information on each job filled during the previous two years, including the title, classification, number of persons interviewed, and the race and gender of the interviewees and successful candidates. The FCC also asked Pasco to provide the recruitment sources used to attract each of its applicants.
 
 
 7
 Pasco reported that it had 58 hiring opportunities from January, 1986 to October 1, 1988 but did not submit its list of recruitment sources. Its failure to provide all the information requested by the FCC was due, according to Pasco, to inadequate recordkeeping resulting from a change in management. Notwithstanding its failure to hire any minorities during that period, it claimed to have "systematically recruited from a plethora of minority and women's organizations whenever it has sought employment applications." The NAACP responded that the licensee had, for the most part, failed to contact minority organizations when actually searching to fill a job and had thus violated the Commission's EEO program requirements. Asserting that discrimination could not be "ruled out," petitioner argued that the new information submitted by intervenor confirmed that a hearing was necessary.
 
 
 8
 The Commission rejected Pasco's bid for a full-term license renewal, but decided that neither further investigation nor a hearing was necessary. Instead, the FCC granted only a short-term renewal, and imposed an $18,000 "forfeiture" upon Pasco along with further reporting requirements in order to assist the FCC in more closely gauging the licensee's future EEO compliance. Applications of Certain Broadcast Stations Serving Communities in the Miami, Florida Area, 5 FCC Rcd 4893, 4898 (1990).
 
 
 9
 Pasco and the NAACP filed petitions for reconsideration, both of which were rejected. The NAACP asserted that the Commission had acted irrationally in ignoring the NAACP's statistical showing that the failure to hire any minorities out of 58 hiring opportunities could not have occurred by chance alone. Intentional discrimination was the only "possible explanation of [the licensee's] behavior." The Commission explained that it had ignored the NAACP's statistical submission because petitioner had employed an analysis relevant to discrimination suits under Title VII; the FCC, however, did not use such elaborate statistical showings in evaluating employment. In the Matter of License Renewal Applications of Pasco Pinellas Broadcasting Company, Licensee of Stations WLVU(AM), Dunnedin, Florida and WLVU-FM, Holiday, Florida, 8 FCC Rcd 398, 399 (1993). Although a statistical disparity between the minority population and the station's employment profile was relevant in determining whether or not to hold a hearing, it was not sufficient evidence by itself to force a hearing. The FCC concluded that there was no hard evidence that the flaws identified (statistical disparity and an unsatisfactory EEO program) were the result of intentional discrimination. Id. The NAACP (but not Pasco) petitions us, raising the same arguments it made before the Commission.
 
 II.
 
 10
 Petitioners, relying on the statistical disparity and claiming that Pasco's explanations for its paucity of minority employees was pretextual, indeed racially stereotypical, claim that the Commission was obliged, under our precedent, to conduct a hearing to resolve the disputed material issue of fact, i.e., whether Pasco discriminated. We have held that "[e]vidence of actual discriminatory conduct in most cases will present a substantial and material question of fact warranting a renewal hearing." Bilingual Bicultural Coalition on Mass Media v. FCC, 595 F.2d 621, 629 (D.C.Cir.1978); see also Black Broadcasting Coalition of Richmond v. FCC, 556 F.2d 59, 64 (D.C.Cir.1977). And, more recently in Beaumont Branch of the NAACP v. FCC, 854 F.2d 501, 510 (D.C.Cir.1988), we remanded to the Commission to conduct a hearing after determining that the petitioners had shown evidence of discrimination.
 
 
 11
 Petitioners rely heavily on Beaumont. But, there we determined that the petitioners had presented actual evidence of intentional discrimination. The licensee, Pyle, acquired the stations in 1981, and two years later, in 1983, when Pyle applied to renew the license, black employment, which had been 33% (11 employees), dropped to 5.6% (one employee). And of 112 new employees hired during that two-year period, only three were black and none stayed longer than two months. Id. at 503. Compounding the suggestion of discrimination, Pyle supplied suspiciously contradictory explanations for the departure of some of the black employees. Id. at 509. To be sure, the licensee there, as here, also lacked an adequate positive EEO program, but as we explained, "[i]f the licensee's only deficiency were its failure to implement an EEO program, the Commission's decision not to hold a hearing might be a reasonable one." Id. at 509. The licensee's submission of contradictory explanations for the sharp, even dramatic, diminution of minority employment in such a short period, however, led us to conclude that the Commission abused its discretion in not conducting a hearing.
 
 
 12
 We do not agree with petitioners that the case before us presents such actual evidence of discrimination that would oblige the Commission to proceed to a hearing. Here we are not faced with a conspicuous departure of minorities en masse nor is there any evidence even suggesting that qualified minority applicants were refused employment. Only one minority applied for a position during 1987-88. Compare Beaumont, 854 F.2d at 507; Bilingual, 595 F.2d at 628. Pasco's explanation for its difficulties in attracting minority employees, moreover, are neither self-contradictory nor suspicious. The petitioners argue that Pasco's explanations are themselves evidence of discrimination because they rely on discriminatory stereotypes of minorities--that minorities, living in the urban areas of the MSA, would be unwilling to commute long distances for a job at low pay and that the minorities in the immediate area are primarily engaged in agricultural work. We do not understand petitioners' argument. Pasco did not stereotype minorities when it merely pointed out that few people who are interested in work at radio stations--minority or white--would be willing to put up with the inconvenient commute from the Tampa area for relatively low pay at the company. (Indeed, as of June 1990, only one of Pasco's employees lived in Clearwater and none in Tampa or St. Petersburg.) It so happens that most of the minorities in the MSA are concentrated in the Tampa-St. Petersburg locale. As for the Company's other explanation--that the minorities living in the immediate area of the station are primarily engaged in migrant agricultural work--we do not think that answer, either, betrays a discriminatory stereotype. It seems quite reasonable to suggest that migrant agricultural workers--again minority or white--will normally be less suitable for white collar or technical jobs in a radio station. After all, Pasco did not suggest it would refuse to consider an applicant with this background. The company was only submitting an explanation to meet the inference of discrimination that petitioners sought to draw from the statistics.[3]
 
 
 13
 Essentially, petitioners rest their case on the statistical disparity[4] and the inadequate EEO program. We have said before that the presence of these factors "raises questions" about whether the licensee merely has a deficient EEO program or has intentionally discriminated. Bilingual, 595 F.2d at 630. The Commission conducted an investigation to gather more information and reasonably concluded that there was no evidence of discrimination to warrant further investigation or a hearing.[5] Were we to force a hearing upon the FCC under these circumstances, we would be converting the FCC's rule into one calling for minority employment to meet numerical goals based on notions of proportionality in the labor market. The FCC has not adopted such a rule and it is hardly open to this court to mandate that result.[6]
 
 
 14
 The Commission did not ignore Pasco's inadequate affirmative EEO program. Rather, it sanctioned Pasco. The FCC criticized Pasco for not contacting minority recruitment sources when actual vacancies came to light and faulted Pasco for failure to maintain proper EEO records. Pasco was also chastised for not concluding that its EEO efforts were not successful. After all, it had failed to hire one minority in 58 opportunities. Accordingly, the Commission fined Pasco $18,000 and, perhaps more significantly, granted Pasco only a short-term renewal under more onerous reporting requirements--keeping Pasco, as it were, on a short leash. The Commission, in our view, thus acted well within its zone of discretion in choosing not to proceed to a hearing or to a further investigation but instead to pressure Pasco to engage in a more fruitful EEO program. The evidence petitioners presented was not sufficient to compel the FCC to do otherwise.
 
 
 15
 * * * * * *
 
 
 16
 Accordingly, the Commission's decision is affirmed.
 
 
 
 [1]
 Though the statute, 47 U.S.C. Sec. 402(b) (1988), refers to this sort of case as an "appeal" from the Commission, we will follow the more standard practice of referring to the parties seeking review of agency action as petitioners
 
 
 [2]
 Where there is a "substantial and material question of fact" raised regarding a licensee's qualifications, the FCC must convene a hearing. 47 U.S.C. Sec. 309(e) (1988)
 
 
 [3]
 The FCC's typical use of the MSA as the labor market recruitment region for a licensee--without evidence that an MSA is the relevant labor market--may represent a focus on recruitment efforts
 
 
 [4]
 As an ancillary argument, the NAACP asserts that the FCC ignored its statistical analysis. The Commission has deemed statistical analyses employed in Title VII cases to be irrelevant in determining compliance with the EEO rule. We have previously stated that we will defer to the Commission's discretion "in determining how it will enforce its own EEO regulations." Tallahassee Branch of the NAACP v. FCC, 870 F.2d 704, 710 (D.C.Cir.1989). This dispute about how to employ statistics is no different
 
 
 [5]
 Though petitioners argue in the alternative that the Commission should have continued to investigate, we believe the FCC acted reasonably in declining to do so, since there was no evidence supporting an inference of discrimination
 
 
 [6]
 That, of course, does not mean that statistics are irrelevant to the issue of actual discrimination; statistics certainly were relevant in Beaumont