141 F.3d 344
 76 Fair Empl.Prac.Cas. (BNA) 857,
72 Empl. Prac. Dec. P 45,246, 329 U.S.App.D.C. 381
 LUTHERAN CHURCH-MISSOURI SYNOD, Appellant
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee
Missouri State Conference of Branches of the NAACP, et al.,
Intervenors
 No. 97-1116.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 12, 1998.
Decided April 14, 1998.
 
 Appeal of an Order of the Federal Communications Commission.
 Barry H. Gottfried argued the cause for appellant, with whom Richard R. Zaragoza, Kathryn R. Schmeltzer, and Gene C. Schaerr were on the briefs.
 Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission, argued the cause for appellee, with whom Christopher J. Wright, General Counsel, C. Grey Pash, Jr., and David Silberman, Counsel, were on the brief. Robert B. Nicholson, Attorney, United States Department of Justice, entered an appearance.
 David E. Honig was on the brief for intervenors Missouri State Conference of Branches of the NAACP, et al.
 Lisa Wilson Edwards, Attorney, United States Department of Justice, was on the brief for the United States as amicus curiae.
 Michael E. Rosman was on the brief for amici curiae Center for Individual Rights and National Religious Broadcasters. Michael P. McDonald, Daniel E. Troy, and Lawrence W. Secrest, III entered appearances.
 Jay A. Sekulow, Mark N. Troobnick, and Colby M. May were on the brief for amicus curiae American Center for Law and Justice.
 Before: SILBERMAN, WILLIAMS, and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 Lutheran Church-Missouri Synod appeals the Federal Communication Commission's finding that it transgressed equal employment opportunity regulations through the use of religious hiring preferences and inadequate minority recruiting. The Church argues that the Commission has violated both its religious freedoms and the equal protection component of the Fifth Amendment and that the Commission unreasonably imposed a $25,000 lack of candor forfeiture. We reverse and remand in part.
 
 I.
 
 2
 Appellant holds licenses for two radio stations in Clayton, Missouri. KFUO(AM), which operates noncommercially, maintains a religious format; KFUO-FM operates commercially and broadcasts classical music with a religious orientation as well as some religious programming. Both stations are housed on the campus of the Church's Concordia Seminary and, as appellant puts it, "have been dedicated to the task of carrying out in their way the Great Commission which Christ gave to His Church, to preach the Gospel to every creature and to nurture and serve the people in a variety of ways." Because of the stations' religious mission, the Church believes that many, if not most, of the positions at the station require a knowledge of Lutheran doctrine.
 
 
 3
 The Commission has adopted equal employment opportunity (EEO) regulations that impose two basic obligations on radio stations. Stations are forbidden to discriminate in employment against any person "because of race, color, religion, national origin, or sex." 47 C.F.R. § 73.2080(a) (1997). And stations must adopt an affirmative action "EEO program" targeted to minorities and women. 47 C.F.R. § 73.2080(b) & (c) (1997). Such a program must include a plan for (1) disseminating the equal opportunity program to job applicants and employees; (2) using minority and women-specific recruiting sources; (3) evaluating the station's employment profile and job turnover against the availability of minorities and women in its recruitment area; (4) offering promotions to minorities and women in a nondiscriminatory fashion; and (5) analyzing its efforts to recruit, hire, and promote minorities and women. 47 C.F.R. § 73.2080(c).
 
 
 4
 After receiving the Church's 1989 licensing renewal applications, Commission staff asked for more information about its affirmative action efforts during the preceding license term. A month later, the NAACP filed a petition to deny the applications, contending that the Church's EEO program was deficient and that it had hired an inadequate number of blacks.[1] The Church responded that it did have minority employees, including blacks, and that it did in fact engage in minority-specific recruitment. But it offered two primary explanations for its relatively low number of minority hires and allegedly inadequate recruiting efforts.
 
 
 5
 First, the Church claimed that its hiring criteria of "knowledge of Lutheran doctrine" and "classical music training" narrowed the local pool of available minorities. Although minorities comprised 15.6% (14.1% black, .8% Hispanic, .5% Asian-Pacific Islander and .2% American Indian) of the St. Louis Missouri-Illinois Metropolitan Statistical Area (MSA), the Church estimated that only 2% of the area population were minorities with Lutheran training and 0.1% were minorities with classical music training. The Church's counsel, Arnold & Porter, derived the 0.1% figure from KFUO-FM's (which was the only full-time classical music station in the area) listenership surveys. Of KFUO-FM's 72,800 listeners, 3.7%--or 2,693--were black, and none were Hispanic or Asian. This represents approximately 0.1% of the population in the St. Louis MSA. And counsel noted that the number of minorities with classical music expertise--as opposed to simply interest--would be even lower. Relying on a Commission policy statement that "the Commission will, in its in-depth reviews, take cognizance of a licensee's inability to employ women or minorities in positions for which the licensee documents that only a very limited number of women or minority groups have the requisite skills,"[2] the Church asserted that the NAACP's numbers did not translate into evidence of discriminatory hiring or recruiting.
 
 
 6
 Second, the Church explained that for many job openings, it did not engage in any outside recruiting, largely because it drew many of its employees from Concordia Seminary. Historically, the stations had an informal agreement with the Seminary whereby the stations operated rent-free in return for hiring seminarians and their spouses when possible. Because the Church thought radio important in its mission and ministry, it viewed working at the stations as part of the seminarians' overall education.[3] These explanations, however, did not satisfy the Commission and they further upset the NAACP, who thought that the station's estimates of minorities with classical music expertise reinforced negative stereotypes of blacks. Seeking more details about the extent of the Church's affirmative action recruiting efforts and the potentially adverse impact of its hiring criteria on blacks, the Commission designated the Church's applications for hearing.
 
 
 7
 The Commission determined that the Church's Lutheran hiring preference was too broad. In re The Lutheran Church/Missouri Synod, 12 F.C.C.R. 2152 (1997) (Lutheran Church ). FCC policy exempts religious broadcasters from the ban on religious discrimination, but only when hiring employees who are reasonably connected to the espousal of religious philosophy over the air. King's Garden, Inc., 38 F.C.C.2d 339 (1972), aff'd sub nom. King's Garden, Inc. v. FCC, 498 F.2d 51 (D.C.Cir.1974). After questioning the Church about the duties attached to various positions, the Commission found it unnecessary for receptionists, secretaries, engineers, and business managers to have knowledge of Lutheran doctrine.
 
 
 8
 The FCC also found that the Church violated the EEO regulations by making insufficient efforts to recruit minorities. In measuring compliance, the ALJ, with subsequent approval by the Commission, divided the license term into two time periods to take account of a shift in FCC policy. Until August 3, 1987, the Commission used purely result-oriented processing standards and automatically reviewed a station's compliance if its minority and female representation was less than 50% of their "overall availability" in the area labor force.[4] A workforce with minority representation matching 100% of overall availability is referred to by the Commission and the ALJ as "parity," a term which reflects the FCC's perception that proportional representation is the norm. To assess the Church's compliance from February 1, 1983 to August 3, 1987, the ALJ relied primarily on labor force statistics. He found that while the Church slipped below 50% of parity during 1983, 1984, 1986, and 1987, it achieved nearly 100% of parity in 1985 and was close enough, on balance, to pass muster. In re The Lutheran Church/Missouri Synod, 10 F.C.C.R. 9911 (1995) (Initial Decision ).
 
 
 9
 Analyzing the remaining two and a half years, the ALJ relied on the Commission's newer enforcement policy that purports to de-emphasize statistics and look more at a station's overall EEO efforts.[5] With 9.1% full-time minority hires, the Church exceeded the Commission's 50% of parity guideline during this period. It failed, however, to utilize a formal EEO process: it did not include an EEO notice on its employment application, regularly solicit applicants from minority-specific sources, or instruct any management level employee to implement a structured EEO program. Moreover, the ALJ found no evidence that the Church had ever "formally evaluated [its] employment profile and job turnover against the availability of minorities and women in [its] recruitment area." Initial Decision, 10 F.C.C.R. at 9912. He observed that although KFUO-FM's general manager decided in 1987 to increase the number of minorities, he waited nearly a year before hiring a Hispanic salesperson. And, importantly for the ALJ, "[t]here [was] no indication that [the general manager's] desire to hire minorities, or that [this woman's] hire in particular, resulted from the type of evaluation contemplated in the Commission's rules." Id.
 
 
 10
 Since he found no evidence that the Church intentionally discriminated against minorities, the ALJ determined that denying renewal would be an inappropriate sanction for the EEO violations. He instead required the Church to submit four reports at six-month intervals with the following information: (1) a list of all job applicants and hires, indicating their referral or recruitment source, job title, part-time or full-time status, date of hire, sex, and race or national origin; (2) a list of all employees, ranked from highest paid to lowest paid, indicating job title, part-time or full-time status, date of hire, sex, and race or national origin; and (3) a narrative statement detailing the stations' efforts to recruit minorities. Id. at 9921-22. The Commission affirmed both the ALJ's findings and the imposition of reporting requirements. Lutheran Church, 12 F.C.C.R. at 2165.
 
 
 11
 The Commission also levied a $25,000 forfeiture for misrepresenting the importance of classical music training in its hiring. Id. at 2166-67. In an Opposition to the NAACP's Motion to Deny, Arnold & Porter had said that "nearly all of the positions within [KFUO-FM's] top four job categories can only be filled by persons who have ... expertise in classical music." Again in a later motion, counsel explained that "nearly all of KFUO's hiring opportunities were for positions requiring specialized knowledge about classical music...." When the Commission asked more questions, however, it became clear that not all employees in fact had a background in classical music. Before the hearing, Dennis Stortz, formerly a management level employee at both stations, submitted an affidavit stating:
 
 
 12
 [W]hen I advised the FCC that it is a requirement that KFUO-FM salespeople possess a background in classical music, I believed and continue to believe that that was true, because KFUO-FM wants its salespeople to possess a background in classical music, and only when we are unable to locate such prospective employees do we hire salespeople without that background. Once the Commission raised a question about our employment practices in this regard, I recognized that I might have provided further detail about our hiring policies in this respect to ensure that the Commission understood that while we seek only salespeople with a classical music background, we are not always successful.
 
 
 13
 Initial Decision, 10 F.C.C.R. at 9904. The Commission held that the Church, in portraying classical music training as "required" rather than "preferred," had exhibited a serious lack of candor. But since the Church acknowledged its error and testified truthfully throughout the remainder of the proceedings, the Commission sanctioned through a fine rather than license denial.
 
 
 14
 Almost two months after we heard argument on the Church's appeal, the FCC filed a motion for partial remand of the record asking that all parts of the case, other than the $25,000 forfeiture, be sent back to the Commission. According to the FCC, a recently released "policy statement" modified the holding in its King's Garden case to permit religious broadcasters to use a religious preference for all positions. See Streamlining Broadcast EEO Rule and Policies, 1998 WL 78418 (FCC Feb. 25, 1998). The Commission's counsel asserted that if the case were remanded, the Commission would apply this new "policy statement" retroactively and vacate those portions of its Lutheran Church order "related to the EEO issue." Commission's counsel, however, after an exchange of pleadings in which appellant opposed the motion, notified us that Commissioner Furchtgott-Roth thought it inappropriate for the Commission to commit itself "concerning the merits of the adjudication on remand." He believed the Commission could make no representations to the court concerning what sort of order might be adopted in the future.
 
 II.
 
 15
 The Church mounts a broad array of challenges to the Commission's order. Some of these challenges are not properly before us because they were not presented to the Commission. See 47 U.S.C. § 405 (1994).[6] The others, however, are quite serious and far-reaching. The Church contends that the affirmative action portion of the Commission's EEO regulations is a race-based employment program in violation of the equal protection component of the Fifth Amendment. Insofar as the EEO regulations as a whole interfere with the Church's ability to prefer Lutherans in hiring, appellant argues that they run afoul of both the Religious Freedom Restoration Act and the Free Exercise Clause. Last, the Church claims that the Commission was arbitrary and capricious in imposing the $25,000 forfeiture.
 
 
 16
 As a preliminary matter, we deal with the Commission's novel, last second motion to remand--which we deny. We simply do not understand, as a matter of administrative law, how we could consider a post-argument "policy statement," which, as Commissioner Furchtgott-Roth correctly pointed out, does not bind the Commission to a result in any particular case. See Pacific Gas & Elec. Co. v. FPC, 506 F.2d 33, 38 (D.C.Cir.1974). The FCC's counsel represents that the Commission on remand would vacate this order, but the Commission has not confessed error--its policy statement is directed only towards the future. Moreover, as the Lutheran Church argues, even if the Commission would overrule King's Garden in this proceeding, it is not apparent just how that would affect the Church. Even under the suggested modification, the Church might well have violated the EEO requirements by not preferring minority Lutherans over nonminority Lutherans. Certainly looking to the future, the Church is bound to comply with the EEO obligation as it relates to Lutherans who happen to have minority status. See Streamlining Broadcast EEO Rule and Policies, 1998 WL 78418, p 9; see also Dynalantic Corp. v. Department of Defense, 115 F.3d 1012 (D.C.Cir.1997). As we recently noted in SBC Communications, Inc. v. FCC, 138 F.3d 410, 420-21 (D.C.Cir.1998), the Commission has on occasion employed some rather unusual legal tactics when it wished to avoid judicial review, but this ploy may well take the prize.
 
 
 17
 We take up first the logically anterior claim and the one on which the Justice Department has filed an amicus curiae brief: whether the FCC's program is consonant with equal protection.[7] The Commission (but not DOJ) asserts that the Church lacks Article III standing to raise an equal protection challenge since it--as opposed to a hypothetical non-minority employee--has not suffered an equal protection injury. It is undeniable, however, that the Church has been harmed by the Commission's order finding it in violation of the EEO regulations. The order is a black mark on the Church's previously spotless licensing record and could affect its chances of license renewal down the road. Meredith Corp. v. FCC, 809 F.2d 863, 868-69 (D.C.Cir.1987). And the remedial reporting conditions, which require the Church to keep extremely detailed employment records, further aggrieve the Church by increasing an already significant regulatory burden.
 
 
 18
 Independent of the order, the regulations cause the Church economic harm by increasing the expense of maintaining a license. Every broadcast station must develop a fairly elaborate EEO program and document its compliance. 47 C.F.R. § 73.2080(b) & (c). Particularly for smaller stations like KFUO(AM) and KFUO-FM, this requirement can be burdensome. It involves paperwork, monitoring, and spending more money on advertisements. And if the rules do force a station to discriminate, they expose it to risk of liability under 42 U.S.C. § 1983 (1994). Monterey Mechanical Co. v. Wilson, 125 F.3d 702, 707 (9th Cir.1997) (giving the example of Bras v. California Public Utilities Commission, 59 F.3d 869 (9th Cir.1995), where Pacific Bell complied with a state statute requiring it to increase minority and women owned business shares of utility contracting and a rejected contractor brought a section 1983 claim against it). Indeed, forced discrimination may itself be an injury. The Ninth Circuit has held that "A person suffers injury in fact if the government requires or encourages as a condition of granting him a benefit that he discriminate against others based on their race or sex." Monterey Mechanical, 125 F.3d at 707.
 
 
 19
 To the extent the Commission suggests that the personal nature of the equal protection right precludes third party standing, the Supreme Court has explicitly rejected that view. In Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), the Court held that white homeowners sued for violating a restrictive covenant had prudential standing to raise the equal protection rights of non-Caucasians, even though no specific third parties were mentioned in the record. The Court said:
 
 
 20
 The law will permit respondent to resist any effort to compel her to observe such a covenant, so widely condemned by the courts, since she is the one in whose charge and keeping reposes the power to continue to use her property to discriminate or to discontinue such use. The relation between the coercion exerted on respondent and her possible pecuniary loss thereby is so close to the purpose of the restrictive covenant, to violate the constitutional rights of those discriminated against, that respondent is the only effective adversary of the unworthy covenant in its last stand.
 
 
 21
 Id. at 259, 73 S.Ct. at 1036. When the law makes a litigant an involuntary participant in a discriminatory scheme, the litigant may attack that scheme by raising a third party's constitutional rights. See also Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (a vendor, who could sell beer to 18 to 20 year old females but not to males of the same age, was allowed to challenge the legislative scheme by raising the equal protection rights of males). There can be no doubt that the Church has standing to make its Fifth Amendment challenge.
 
 
 22
 The Church argues that under Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), the Commission's use of racial classifications provokes strict scrutiny, a standard the EEO program cannot survive. The FCC has identified "diversity of programming" as the interest behind its EEO regulations. The Church protests that this is an insufficient interest and that furthermore, the regulations do not serve it. As we have noted, the Commission, applying its King's Garden policy, decided that the Church could not prefer Lutheran to non-lutheran secretaries because low-level employees would have little or no effect on the broadcast of religious views. At the same time, however, the Commission has defended its affirmative action recruiting policy by arguing that all employees affect programming diversity. How, the Church asks, can the FCC maintain that the religion of a secretary will not affect programming but the race of a secretary will? After all, religious affiliation, a matter of affirmative intellectual and spiritual decision, is far more likely to affect programming than skin color. Appellant contends that the FCC's convoluted reasoning undermines the suggestion that there is any kind of link between the Commission's means and end, much less a narrowly tailored one.
 
 
 23
 Neither the Commission nor the Justice Department have claimed that the Fifth Amendment is wholly inapplicable to this case.[8] If the regulations merely required stations to implement racially neutral recruiting and hiring programs, the equal protection guarantee would not be implicated. But as the Commission itself has said, "Our broadcast EEO rules require that broadcast licensees ... establish and maintain an affirmative action program for qualified minorities and women."[9] Proceeding within the equal protection framework, the Commission and DOJ argue that we should review the EEO program under rational basis rather than the more demanding strict scrutiny standard which has tested race-based government classifications since Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944). Though the Supreme Court did not initially apply strict scrutiny to federal "affirmative action" programs, see Metro Broadcasting, Inc. v. FCC, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), it recently reversed itself to hold that strict scrutiny applies whether or not the government's motivation to aid minorities can be thought "benign." Adarand, 515 U.S. at 227, 115 S.Ct. at 2112-13. The Commission and DOJ, however, argue that Adarand does not go so far as it appears. The Commission insists that Adarand reaches only race-conscious "hiring decisions." Taking a slightly different approach, the Justice Department urges that it only applies to race-conscious "decision-making." But both say that because the EEO regulations stop short of establishing preferences, quotas, or setasides, rational basis is the appropriate standard.
 
 
 24
 We rather doubt that restricting Adarand to race-based "decision-making"--as DOJ would have us do--would save these regulations from strict scrutiny. They affect all kinds of employment decisions. For example, when deciding how to fill job vacancies, the regulations require a station to choose minority-specific referral sources. 47 C.F.R. § 73.2080(c)(2). Likewise, an employer must conduct a formal analysis of its success in recruiting women and minorities and make decisions about its selection techniques and tests accordingly. 47 C.F.R. § 73.2080(c)(5). The Justice Department surely cannot be taking the position that these are not decisions, but must be joining the Commission in claiming that these sorts of decisions are just too insignificant to count. Under Title VII, courts have distinguished between "preliminary" and "ultimate" employment decisions. See, e.g., Page v. Bolger, 645 F.2d 227, 233 (4th Cir.1981) (en banc) (holding that section 717, which forbids the government from discriminating in "personnel actions," does not apply to decisions with no immediate effect on employment.) Even if we thought that some of the requirements of § 73.2080(c)--those which could be described as outreach efforts--had no real or immediate effect on employment, we are not sure that we would accept the government's premise. While there is a textual basis under Title VII for drawing such a line, the Equal Protection Clause would not seem to admit a de minimis exception.
 
 
 25
 We need not decide this question, however, because the EEO regulations before us extend beyond outreach efforts and certainly influence ultimate hiring decisions. The crucial point is not, as the Commission and DOJ argue, whether they require hiring in accordance with fixed quotas; rather, it is whether they oblige stations to grant some degree of preference to minorities in hiring. We think the regulations do just that. The entire scheme is built on the notion that stations should aspire to a workforce that attains, or at least approaches, proportional representation.[10] The EEO program guidelines instruct the broadcaster to:
 
 
 26
 (3) Evaluate its employment profile and job turnover against the availability of minorities and women in its recruitment area. For example, this requirement may be met by:
 
 
 27
 (i) Comparing the composition of the relevant labor area with the composition of the station's workforce;
 
 
 28
 (ii) Where there is underrepresentation of either minorities and/or women, examining the company's personnel policies and practices to assure that they do not inadvertently screen out any group and take appropriate action where necessary. Data on representation of minorities and women in the available labor force are generally available on metropolitan statistical area (MSA) or county basis.
 
 
 29
 47 C.F.R. § 73.2080(c) (emphasis added). The very term "underrepresentation" necessarily implies that if such a situation exists, the station is behaving in a manner that falls short of the desired outcome. The regulations pressure stations to maintain a workforce that mirrors the racial breakdown of their "metropolitan statistical area." Recall that in this case, the NAACP argued that the station should be given no credit for hiring Hispanics because of their small representation in the relevant workforce. In his decision, the ALJ discounted the hire of the Hispanic woman because her employment did not flow from the "type of evaluation contemplated in the Commission's rules." Initial Decision, 10 F.C.C.R. at 9912. That means that either the ALJ agreed with the NAACP (because if the Church had focused on the SMSA profile, it would have hired a black rather than a Hispanic) or he thought that the station was insufficiently race conscious when it hired her (which, admittedly, sounds somewhat Orwellian).
 
 
 30
 The Commission and DOJ nevertheless insist that the FCC's program should be regarded as if it did no more, or not significantly more, than seek non-discriminatory treatment of women and minorities. That argument--which logically suggests the government should have challenged the very applicability of the Fifth Amendment--presupposes that non-discriminatory treatment typically will result in proportional representation in a station's workforce. The Commission provides no support for this dubious proposition and has in fact disavowed it, saying that "we do not believe that fair employment practices will necessarily result in the employment of any minority group in direct proportion to its numbers in the community." EEO Processing Guidelines for Broadcast Renewal Applicants, 79 F.C.C.2d 922, p 19 (1980).
 
 
 31
 Nor can it be said that the Commission's parity goals do not pressure license holders to engage in race-conscious hiring. In 1980, the Commission issued processing guidelines disclosing the criteria it used to select stations for in-depth EEO review when their licenses came up for renewal. EEO Processing Guidelines for Broadcast Renewal Applicants, 46 RR 2d 1693 (1980).[11] This is the policy that the ALJ used to measure the Church's compliance with the regulations during the first part of the license term, when he found that it met the numbers. These 1980 criteria are:
 
 
 32
 (1) stations with less than five full-time employees will continue to be exempt from having a written EEO program;
 
 
 33
 (2) stations with five to ten full-time employees will have their EEO program reviewed if minority groups and/or women are not employed on their full-time staffs at a ratio of 50% of their workforce availability overall and 25% in the upper-four Form 395 job categories;
 
 
 34
 (3) stations with 11 or more full-time employees will have their EEO programs reviewed if minority groups and/or women are not employed full time at a ratio of 50% of their availability in the workforce overall and 50% in the upper-four job categories; and
 
 
 35
 (4) all stations with 50 or more employees will have their EEO programs reviewed.
 
 
 36
 Id.[12] It cannot seriously be argued that this screening device does not create a strong incentive to meet the numerical goals. No rational firm--particularly one holding a government-issued license--welcomes a government audit. Even DOJ argued, in comments to the Commission recommending that these guidelines be changed, that they operated as a "de facto hiring quota," and that "broadcasters, in order to avoid the inconvenience and expense of being subjected to further review, will treat the guidelines as 'safe-harbors.' " Amendment of Part 73, 2 F.C.C.R. 3967, p 45 (1987).
 
 
 37
 In 1987, the Commission changed its policy to de-emphasize statistics, but this new policy did not abandon the 1980 numerical processing guidelines. Amendment of Part 73, 2 F.C.C.R. 3967 (1987). Instead, the Commission now looks at them along with the descriptions of the station's EEO program and policies, any EEO complaints filed against it, and any other pertinent information available. Id., p 48-50. The FCC, to be sure, has emphasized that the guidelines should not be interpreted as a quota, and its licensing decisions indicate that stations cannot achieve compliance simply by meeting the 50% of parity goal. See, e.g., Kelly Communications, Inc., 1997 WL 662077 (FCC Oct. 27, 1997) (licensee who hired at 50% of parity was nevertheless sanctioned for failing to keep recruiting records). But the fact that the FCC looks at more than "numbers" does not mean that numbers are insignificant. A station would be flatly imprudent to ignore any one of the factors it knows may trigger intense review--especially if that factor, like racial breakdown, is particularly influential. As a matter of common sense, a station can assume that a hard-edged factor like statistics is bound to be one of the more noticed screening criteria. The risk lies not only in attracting the Commission's attention, but also that of third parties. "Underrepresentation" is often the impetus (as it was in this case) for the filing of a petition to deny, which in turn triggers intense EEO review. Amendment of Part 73, p 48. Further, and most significant in a station's calculus, the Commission itself has given every indication that the employment profile is a serious matter. In its proposed EEO forfeiture guidelines, for example, minority underrepresentation is grounds for an upward adjustment in forfeiture amount. Streamlining Broadcast EEO Rule and Policies, 11 F.C.C.R. 5154 (1996). Similarly, the EEO regulation applicable to television stations warns that the Commission will send a letter recommending "any necessary improvements" to licensees whose minority representation falls below the FCC's processing guidelines. 47 C.F.R. § 73.2080(d) (1997). A radio licensee would have every reason to think this indicative of the Commission's approach, especially since this rule appears as a subsection in the general EEO regulation. In sum, under both its current and past practice, the Commission has used enforcement to harden the suggestion already present in its EEO program regulations.
 
 
 38
 In his Adarand dissent, Justice Stevens described the program in that case as containing no quota or rigid preference. Adarand, 515 U.S. at 262-63, 115 S.Ct. at 212930. There, the agency encouraged minority hiring by offering a bonus to those contractors who employed minority subcontractors. Id. at 209, 115 S.Ct. at 2103-04. Although it was urged that such "goals" should be treated differently than obligatory set-asides, the majority did not even pause to consider this argument. Similarly, we do not think it matters whether a government hiring program imposes hard quotas, soft quotas, or goals. Any one of these techniques induces an employer to hire with an eye toward meeting the numerical target. As such, they can and surely will result in individuals being granted a preference because of their race. As the Court said in Adarand, "All governmental action based on race ... should be subjected to detailed judicial inquiry." Id. at 226, 115 S.Ct. at 2112-13 (emphasis added). Strict scrutiny applies and we turn to whether, in accordance with recognized doctrine, the regulations are narrowly tailored to serve a compelling state interest.
 
 
 39
 * * * * * *
 
 
 40
 The Commission has unequivocally stated that its EEO regulations rest solely on its desire to foster "diverse" programming content. The Justice Department, on the other hand, argues that the FCC's policy is supported by twin governmental goals of seeking diversity of programming and preventing employment discrimination. It may be that the Commission has framed its objective more narrowly because it doubts that it has authority to promulgate regulations on an anti-discrimination rationale. As we have observed elsewhere, "the FCC is not the Equal Employment Opportunity Commission ... and a license renewal proceeding is not a Title VII suit." Bilingual Bicultural Coalition on Mass Media, Inc. v. FCC, 595 F.2d 621, 628 (D.C.Cir.1978) (en banc). The only possible statutory justification for the Commission to regulate workplace discrimination would be its obligation to safeguard the "public interest," and the Supreme Court has held that an agency may pass antidiscrimination measures under its public interest authority only insofar as discrimination relates to the agency's specific statutory charge. NAACP v. FPC, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976). Thus the FCC can probably only regulate discrimination that affects "communication service"--here, that means programming. 47 U.S.C. § 151 (1994); see NAACP v. FPC, 425 U.S. at 670 n. 7, 96 S.Ct. at 1812 n. 7. But it does not really matter why the FCC has expressed the government interest differently than DOJ. As the independent agency which promulgated the regulations in question, its view of the government interest it was pursuing must be accepted.
 
 
 41
 The Commission never defines exactly what it means by "diverse programming."[13] (Any real content-based definition of the term may well give rise to enormous tensions with the First Amendment. Compare Metro Broadcasting, 497 U.S. at 567-68, 110 S.Ct. at 3010-11 (opinion of the Court) with id. at 616, 110 S.Ct. at 3036 (O'Connor, J., dissenting)). The government's formulation of the interest seems too abstract to be meaningful. The more appropriate articulation would seem the more particular: the fostering of programming that reflects minority viewpoints or appeals to minority tastes. Still, the Supreme Court, in Metro Broadcasting, recognized an abstract diversity interest as "important" without being much more precise about it than the Commission. And although Metro Broadcasting 's adoption of intermediate scrutiny was overruled in Adarand, its recognition of the government interest in "diverse" programming has not been disturbed by the Court. The government thus argues that we are bound by that determination.
 
 
 42
 We do not think that proposition at all evident. Even if Metro Broadcasting remained good law in that respect, it held only that the diversity interest was "important." We do not think diversity can be elevated to the "compelling" level, particularly when the Court has given every indication of wanting to cut back Metro Broadcasting. In that case, the majority's analysis of the government's "diversity" interest seems very much tied to the more forgiving standard of review it adopted. It is true that the Court, denying that the supposed "link between expanded minority ownership and broadcast diversity rest[s] on impermissible stereotyping," thought the Commission and Congress had produced adequate evidence of a nexus between minority ownership and programming that reflects a minority viewpoint. Metro Broadcasting, 497 U.S. at 579, 110 S.Ct. at 3016-17. Yet the Court never explained why it was in the government's interest to encourage the notion that minorities have racially based views. Cf. J.E.B. v. Alabama, 511 U.S. 127, 135-43, 114 S.Ct. 1419, 1424-29, 128 L.Ed.2d 89 (1994). We do not mean to suggest that race has no correlation with a person's tastes or opinions.[14] We doubt, however, that the Constitution permits the government to take account of racially based differences, much less encourage them. One might well think such an approach antithetical to our democracy. See id. at 140, 114 S.Ct. at 1427 ("The community is harmed by the State's participation in the perpetuation of invidious group stereotypes...."). Indeed, its danger is poignantly illustrated by this case. It will be recalled that one of the NAACP's primary concerns was its belief that the Church had stereotyped blacks as uninterested in classical music.
 
 
 43
 Justice O'Connor's powerful dissent in Metro Broadcasting, which described the government's interest as "certainly amorphous," protested:
 
 
 44
 The FCC and the majority of this Court understandably do not suggest how one would define or measure a particular viewpoint that might be associated with race, or even how one would assess the diversity of broadcast viewpoints. Like the vague assertion of societal discrimination, a claim of insufficiently diverse broadcasting viewpoints might be used to justify equally unconstrained racial preferences, linked to nothing other than proportional representation of various races. And the interest would support indefinite use of racial classifications, employed first to obtain the appropriate mixture of racial views and then to ensure that the broadcasting spectrum continues to reflect that mixture. We cannot deem to be constitutionally adequate an interest that would support measures that amount to the core constitutional violation of "outright racial balancing."
 
 
 45
 ....
 
 
 46
 ... the interest in diversity of viewpoints provides no legitimate, much less important, reason to employ race classifications apart from generalizations impermissibly equating race with thoughts and behavior.
 
 
 47
 497 U.S. at 614-15, 110 S.Ct. at 3035-36 (emphasis added) (citation omitted). Thus in Metro Broadcasting, four Justices (who were subsequently in the Adarand majority) argued that the government's desire to encourage broadcast content that reflected a racial view was at odds with equal protection. Even the majority in Metro Broadcasting who thought the government's interest "important" must have concluded implicitly that it was not "compelling"; otherwise, it is unlikely that the majority would have adopted a wholly new equal protection standard to decide the case as it did. After carefully analyzing Metro Broadcasting 's opinions and considering the impact of Adarand, it is impossible to conclude that the government's interest, no matter how articulated, is a compelling one.
 
 
 48
 As a final point, we note the sort of diversity at stake in this case has even less force than the "important" interest at stake in Metro Broadcasting. While the minority ownership preferences involved in Metro Broadcasting rested on an inter-station diversity rationale, the EEO rules seek intrastation diversity. It is at least understandable why the Commission would seek station to station differences, but its purported goal of making a single station all things to all people makes no sense. It clashes with the reality of the radio market, where each station targets a particular segment: one pop, one country, one news radio, and so on.
 
 
 49
 * * * * * *
 
 
 50
 Even assuming that the Commission's interest were compelling, its EEO regulations are quite obviously not narrowly tailored. The majority in Metro Broadcasting never suggested that low-level employees, as opposed to upper-level employees, would have any broadcast influence. Nor did the Commission introduce a single piece of evidence in this case linking low-level employees to programming content. See Lamprecht v. FCC, 958 F.2d 382 (D.C.Cir.1992) (sex-based preference failed when FCC introduced no evidence supporting a link between female ownership and "female programming"). Indeed, as appellant emphasizes, the FCC's King's Garden policy indicates that the Commission itself does not believe that there is any connection between low-level employees and programming substance. The Commission reprimanded the Church for preferring Lutheran secretaries, receptionists, business managers, and engineers precisely because it found these positions not "connected to the espousal of religious philosophy over the air." Yet it has defended its affirmative action rules on the ground that minority employees bring diversity to the airwaves. The FCC would thus have us believe that low-level employees manage to get their "racial viewpoint" on the air but lack the influence to convey their religious views. That contradiction makes a mockery out of the Commission's contention that its EEO program requirements are designed for broadcast diversity purposes. The regulations could not pass the substantial relation prong of intermediate scrutiny, let alone the narrow tailoring prong of strict scrutiny.
 
 
 51
 Perhaps this is illustrative as to just how much burden the term "diversity" has been asked to bear in the latter part of the 20th century in the United States. It appears to have been coined both as a permanent justification for policies seeking racial proportionality in all walks of life ("affirmative action" has only a temporary remedial connotation) and as a synonym for proportional representation itself. It has, in our view, been used by the Commission in both ways. We therefore conclude that its EEO regulations are unconstitutional and cannot serve as a basis for its decision and order in this case.
 
 
 52
 Because we so hold, we think it imprudent to decide the Church's RFRA and free exercise challenges to the King's Garden policy. To be sure, we have held only that the Commission's EEO program requirements are unconstitutional; therefore, our decision does not reach the Commission's non-discrimination rule which King's Garden interprets. See 47 C.F.R. § 73.2080(a). But our opinion has undermined the proposition that there is any link between broad employment regulation and the Commission's avowed interest in broadcast diversity. We think, therefore, that the appropriate course is to remand to the FCC so it can determine whether it has authority to promulgate an employment non-discrimination rule.
 
 III.
 
 53
 There remains the $25,000 forfeiture for the station's lack of candor. The Commission insists that substantial evidence supports its finding. But the only evidence is two pleadings in which the Church's counsel described classical music training as a "requirement." The Commission relies on the AMERICAN HERITAGE DICTIONARY (New College Ed.1976), which defines "requirement" as "[T]hat which is required; something needed" or "[S]omething obligatory; a prerequisite." Id. at 1105. But WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981 ed.) gives the word "requirement" more leeway, defining it: "something that is wanted or needed" or "something called for or demanded." Id. at 1929 (emphasis added.) We are not exalting one dictionary over another, but simply pointing out that the Commission has overstated the word's clarity. The Church's explanation for its use of the word "required" jibes with common understanding of the term. It is unremarkable to call a particular criterion a "requirement" even if you must sometimes bend it to fill a job opening. Particularly since the Church immediately clarified its position when questioned, it is an intolerable stretch to call its use of an ambiguous word an "intent to deceive." We are not surprised that the Commission could not point us to a single case where we have affirmed a finding of lack of candor on such slim facts. We vacate both the lack of candor determination and the $25,000 forfeiture.
 
 
 54
 * * * * * *
 
 
 55
 Accordingly, the Commission's order is reversed in part and remanded in part.
 
 
 56
 So Ordered.
 
 
 
 [1]
 The FCC defines "minority" as "Blacks not of Hispanic origin, Asians or Pacific Islanders, American Indians or Alaskan Natives and Hispanics." Amendment of Part 73 of the Commission's Rules Concerning Equal Employment Opportunity in the Broadcast Radio and Television Services, 2 F.C.C.R. 3967 (1987) (Amendment of Part 73 ), petition for recon. pending. But the NAACP, and in the initial investigation, the Commission, focused on blacks only. Indeed, the NAACP argued that the Church should not receive credit for hiring a Hispanic because there were so few Hispanics in the labor market. The Commission's policy is to gauge compliance by using the overall percentage of minorities unless a particular racial group predominates within the entire Metropolitan Statistical Area (MSA). It does not use the numbers for a particular racial group merely because it is the dominant group within the minority segment. In re License Renewal Applications of Certain Broadcast Stations Serving the Chicago Metropolitan Area, 89 F.C.C.2d 1031, p 5 (1982); Bilingual Bicultural Coalition on Mass Media, Inc. v. FCC, 595 F.2d 621, 626 n. 7 (D.C.Cir.1978) (en banc)
 
 
 [2]
 Equal Employment Opportunity Processing Guideline Modifications for Broadcast Renewal Applicants, 79 F.C.C.2d 932 (1980)
 
 
 [3]
 The Church believed that the program was important for spouses as well as seminarians because spouses "often played an important role as partners in their spouse's ministry after graduation."
 
 
 [4]
 See EEO Processing Guidelines for Broadcast Renewal Applicants, 46 RR 2d 1693 (1980), recon. denied, 79 F.C.C.2d 922 (1980)
 
 
 [5]
 See Amendment of Part 73, 2 F.C.C.R. 3967
 
 
 [6]
 The Church did not argue to the Commission (1) that its decision violated the Free Speech Clause of the First Amendment, or (2) that it unreasonably failed to re-examine the wisdom of continuing its King's Garden policy
 
 
 [7]
 The principle of avoiding constitutional questions might suggest that we decide the RFRA question first, but given the FCC's possible shift on King's Garden, that order of analysis would seem peculiar. In any event, the RFRA question is itself intertwined with constitutional issues
 
 
 [8]
 Compare Raso v. Lago, 135 F.3d 11 (1st Cir.1998) where the First Circuit held that federal fair housing requirements did not implicate the equal protection component of the Fifth Amendment. There, state law would have given a housing preference to a group of displaced residents who happened to be predominantly white; federal law mandated that federally funded housing be available to all applicants regardless of race. When HUD required that some of the apartments reserved for the displaced residents be opened to all applicants, the displaced residents claimed that the government had violated their right to equal protection. The First Circuit, however, held that HUD's racially neutral housing requirement no more implicated the equal protection guarantee than a nondiscrimination statute like Title VII
 
 
 [9]
 Amendment of Part 73 of the Commission's Rules Concerning Equal Employment Opportunity in the Broadcast Radio and Television Services, 4 F.C.C.R. 1715 (1989). The gender classification has not been challenged in this case, so we will not address it. But see Lamprecht v. FCC, 958 F.2d 382 (D.C.Cir.1992)
 
 
 [10]
 In Florida State Conference of Branches of the NAACP v. FCC, 24 F.3d 271 (D.C.Cir.1994), a case where neither party raised an equal protection challenge to the regulations, we stated in dicta that the FCC's program does "not, however, purport to require a licensee to achieve numerical goals of minority employment as do certain government 'affirmative action plans.' " Id. at 272. That was the FCC's characterization, but we now conclude that it was an over-simplification
 
 
 [11]
 The Commission had used a comparative analysis even before 1980. In 1975, the Commission directed each broadcaster to "determine whether qualified minorities and women [were] employed on its work force in some reasonable relationship to the numbers in the local labor market," and, if a "substantial incongruence " was found, to describe its remedial steps. Nondiscrimination in the Employment Policies and Practices of Broadcast Licensees, 54 F.C.C.2d 354, p 20 (1975) (emphasis added). "Reasonable relationship" was not defined. In 1977, the FCC released Public Notice No. 14932, which first established a numerical standard: stations with more than 10 full-time employees would be reviewed if minorities were not employed at a ratio of 50% of their overall availability and 25% in the upper-four job categories
 
 
 [12]
 The FCC subsequently clarified that it erroneously used the word "workforce" instead of "labor force" in these guidelines. The labor force, as opposed to the workforce, includes unemployed individuals. Equal Employment Opportunity Processing Guideline Modifications for Broadcast Renewal Applicants, 79 F.C.C.2d 922, 924 n.6 (1980)
 
 
 [13]
 It is clear, though, that the Commission is not referring to format diversity--i.e., the FCC's interest in ensuring that not every station on the spectrum is devoted to news radio
 
 
 [14]
 For example, BBDO's annual television survey consistently finds that blacks and whites prefer different television shows--during the 1996-97 season, the black "top twenty" list and the white "top twenty" list had only four programs in common. Report on Black TV Viewing Habits Shows Split Between Black, Other Viewers, N.Y. AMSTERDAM NEWS, January 26, 1997. But it is not simply a question of race. Among teens aged 12 to 17, 8 out of 20 programs appeared on both lists; in the over 50 age group, there were 13 crossover programs. Id. Latino and white viewing preferences, moreover, are very similar, with 13 of the top twenty programs in common. Latinos Favor Mainstream as Regards Network Viewing, N.Y. DAILY NEWS, January 9, 1998. Race, by itself, seems a rather unreliable proxy for taste