United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

---------

 Filed September 15, 1998

 No. 97-1116

 Lutheran Church-Missouri Synod, 

 Appellant

 v.

 Federal Communications Commission, 

 Appellee

 Missouri State Conference of Branches 

 of the NAACP, et al., 

 Intervenors

---------

 On Suggestions of Rehearing

 En Banc

---------

 Before: Edwards, Chief Judge, Wald, Silberman, 
Williams, Ginsburg, Sentelle, Henderson Randolph, Rogers, 
Tatel and Garland, Circuit Judges.

 O R D E R

 Respondent's and Intervenor's Suggestions of Rehearing 
En Banc and the response thereto have been circulated to 

the full court. The taking of a vote was requested. Thereaf-
ter, a majority of the judges of the court in regular active 
service did not vote in favor of the suggestions. Upon 
consideration of the foregoing, it is

 Ordered that the suggestions be denied.

 Per Curiam

 FOR THE COURT:

 Mark J. Langer, Clerk

 

 A statement by Chief Judge Edwards, with whom Wald, 
Circuit Judge, concurs, dissenting from the denial of the 
suggestions of rehearing en banc is attached.

 

 A statement filed by Circuit Judge Tatel, with whom 
Wald, Circuit Judge, concurs, dissenting from the denial of 
the suggestions of rehearing en banc is also attached.

 

 Circuit Judge Rogers would grant the suggestions of re-
hearing en banc.

 

 Circuit Judge Garland did not participate in this matter.


 Separate statement filed by Chief Judge Edwards, with 
whom Wald, Circuit Judge, concurs, dissenting from the 
denial of the suggestions of rehearing en banc.

 Edwards, Chief Judge, dissenting from the denial of rehear-
ing en banc: By subjecting an agency's nonpreferential anti-
discrimination policies to scrutiny appropriate only for racial 
classifications, the panel in this case has created a constitu-
tional issue where none exists.

 At issue are equal employment opportunity regulations 
promulgated by the Federal Communications Commission 
("Commission" or "FCC"). The regulations prohibit discrimi-
nation in employment. See 47 C.F.R. s 73.2080(a) (1997). 
The regulations also require broadcast stations to maintain "a 
positive continuing program of specific practices designed to 
ensure equal opportunity in every aspect of station employ-
ment policy and practice." 47 C.F.R. s 73.2080(b). In par-
ticular, broadcasters are required to make sure that manag-
ers, employees, and prospective employees are fully apprised 
of the equal employment opportunity policy; in addition, 
broadcasters are required to "conduct continuing review of 
job structure and employment practices" to ensure equal 
employment opportunity. Id. Finally, under "EEO program 
requirements," broadcasters are instructed that, "to the ex-
tent possible, and to the extent that they are appropriate in 
terms of the station's size, location, etc.," a broadcaster 
should consider the following actions to facilitate equal em-
ployment opportunity:

 ....

 (1) Disseminate its equal opportunity program to job 
 applicants and employees. For example, this require-
 ment may be met by:

 (i) Posting notices in the station's office and other 
 places of employment, informing employees, and appli-
 cants for employment, of their equal employment op-
 portunity rights. Where it is appropriate, such equal 
 employment opportunity notices should be posted in 
 languages other than English;

 (ii) Placing a notice in bold type on the employment 
 application informing prospective employees that dis-
 crimination because of race, color, religion, national ori-
 gin, or sex is prohibited;

 (iii) Seeking the cooperation of labor unions, if repre-
 sented at the station, in the implementation of its EEO 
 program and the inclusion of nondiscrimination provi-
 sions in union contracts;

 (iv) Utilizing media for recruitment purposes in a man-
 ner that will contain no indication, either explicit or 
 implicit, of a preference for one sex over another and 
 that can be reasonably expected to reach minorities and 
 women.

 (2) Use minority organizations, organizations for wom-
 en, media, educational institutions, and other potential 
 sources of minority and female applicants, to supply 
 referrals whenever job vacancies are available in its 
 operation. For example, this requirement may be met 
 by:

 (i) Placing employment advertisements in media that 
 have significant circulations among minorities residing 
 and/or working in the recruiting area;

 (ii) Recruiting through schools and colleges, including 
 those located in the station's local area, with significant 
 minority-group enrollments;

 (iii) Contacting, both orally and in writing, minority 
 and human relations organizations, leaders, and spokes-
 men and spokeswomen to encourage referral of qualified 
 minority or female applicants;

 (iv) Encouraging current employees to refer minority 
 or female applicants;

 (v) Making known to recruitment sources in the em-
 ployer's immediate area that qualified minority members 
 and females are being sought for consideration whenever 
 you hire and that all candidates will be considered on a 
 nondiscriminatory basis.

 (3) Evaluate its employment profile and job turnover 
 against the availability of minorities and women in its 
 recruitment area. For example, this requirement may 
 be met by:

 (i) Comparing the composition of the relevant labor 
 area with composition of the station's workforce;

 (ii) Where there is underrepresentation of either mi-
 norities and/or women, examining the company's person-
 nel policies and practices to assure that they do not 
 inadvertently screen out any group and take appropriate 
 action where necessary. Data on representation of mi-
 norities and women in the available labor force are 
 generally available on a metropolitan statistical area 
 (MSA) or county basis.

 (4) Undertake to offer promotions of qualified minori-
 ties and women in a nondiscriminatory fashion to posi-
 tions of greater responsibility. For example, this re-
 quirement may be met by:

 (i) Instructing those who make decisions on placement 
 and promotion that qualified minority employees and 
 females are to be considered without discrimination, and 
 that job areas in which there is little or no minority or 
 female representation should be reviewed;

 (ii) Giving qualified minority and female employees 
 equal opportunity for positions which lead to higher 
 positions. Inquiring as to the interest and skills of all 
 lower paid employees with respect to any of the higher 
 paid positions.

 (5) Analyze its efforts to recruit, hire, and promote 
 minorities and women and address any difficulties en-
 countered in implementing its equal employment oppor-
 tunity program. For example, this requirement may be 
 met by:

 (i) Avoiding use of selection techniques or tests that 
 have the effect of discriminating against qualified minori-
 ty groups or females;

 (ii) Reviewing seniority practices to ensure that such 
 practices are nondiscriminatory;

 (iii) Examining rates of pay and fringe benefits for 
 employees having the same duties, and eliminating any 
 inequities based upon race or sex discrimination.

47 C.F.R. s 73.2080(c).

 The Commission also utilizes internal guidelines for pro-
cessing license renewal applications. Under these guidelines, 
when deciding how closely to examine compliance with equal 
opportunity regulations by a station employing between five 
and fifty full-time employees, the Commission will consider 
the ratio of minority and women employees to the available 
workforce as one of several factors. See Amendment of Part 
73, 2 F.C.C.R. 3967, p 45 (1987); EEO Processing Guidelines 
for Broadcast Renewal Applicants, 46 RR 2d 1693 (1980).

 It seems to me that the challenged regulations command 
virtually nothing, save good faith efforts by broadcasters to 
ensure against unlawful employment discrimination. This 
notwithstanding, the panel somehow viewed the FCC regula-
tions as "certainly influenc[ing] ultimate hiring decisions" and 
"oblig[ing] stations to grant some degree of preference to 
minorities in hiring." See Lutheran Church v. FCC, 141 F.3d 
344, 351 (D.C. Cir. 1998). Accordingly, the panel concluded 
that the regulations constituted the kind of racial classifica-
tion that must be subjected to strict scrutiny under Adarand 
Constructors, Inc. v. Pena, 515 U.S. 200 (1995). See 141 F.3d 
at 351. This analysis mischaracterizes the regulations, with 
serious consequences.

 The regulations in no way draw any kind of racial classifica-
tion. They plainly do not "oblige" anyone to exercise any 
sort of hiring preference. Rather, the regulations merely 
facilitate the avoidance of unlawful employment discrimina-
tion. The regulations "influence" hiring decisions only in the 
sense that anti-discrimination law generally seeks to influence 
employers to avoid bias. Therefore, I cannot understand how 
it can be concluded that the regulations constitute a racial 
classification. Because there is no racial classification at 


issue here, there is no real constitutional issue to be decided 
in this case.

 * * *

 Because the panel decision purports to decide major issues 
of constitutional law where none exist, this case "presents 
questions of 'real significance to the legal process as well as to 
the litigants,' " Bartlett v. Bowen, 824 F.2d 1240, 1244 (D.C. 
Cir. 1987). Thus, in my view, review by the full court is 
required.

 * * *

 Under Adarand, the existence of "racial classification" in a 
federal statute triggers strict scrutiny. See Adarand, 515 
U.S. at 227. It is clear that Adarand, which consistently used 
the language of "racial classification," see id. at 215, 223, 224, 
227, dealt only with policies that actually classified on the 
basis of race. A careful look at the regulations here reveals 
that they do not include any such classification, and that 
Adarand therefore does not apply to them.

 The panel here found that the Commission's regulations 
constituted a racial classification under Adarand, because, in 
the panel's view, "[t]he entire scheme is built on the notion 
that stations should aspire to a workforce that attains, or at 
least approaches, proportional representation." 141 F.3d at 
351-52. In so finding, the panel relied primarily on two 
pieces of evidence. The first was the regulations' require-
ment that stations evaluate themselves, and, when finding 
"underrepresentation" of minorities, determine whether their 
hiring policies "inadvertently" discriminated. See 47 C.F.R. 
s 73.2080(c)(3)(ii). The second piece of evidence, on which 
the panel relied heavily, was a set of processing guidelines 
that the FCC issued for internal review of licensing renewals. 
Under the guidelines, a station that did not meet certain 
numerical criteria could be subjected to closer review to 
determine equal opportunity compliance. See Amendment of 
Part 73, 2 F.C.C.R. 3967, p 45 (1987); EEO Processing 
Guidelines for Broadcast Renewal Applicants, 46 RR 2d 1693 
(1980). The panel thought these guidelines offered an incen-
tive to stations to employ hiring preferences. This incentive, 

the panel concluded, was encouragement sufficient to trigger 
strict scrutiny.

 The panel was undoubtedly correct in stating that regula-
tions that "oblige stations to grant some degree of preference 
to minorities in hiring" would constitute a racial classification 
and would trigger strict scrutiny. See 141 F.3d at 351 
(emphasis added). The serious problem with the panel's 
analysis, however, is that the regulations here do not "oblige" 
anyone to exercise any preference. The most they do, even 
arguably, is to encourage stations fairly to consider minority 
applications. Instructing stations to use statistical analysis 
as one possible method of checking themselves for uninten-
tional discrimination could not conceivably be understood as 
"obliging" or "encouraging" the use of any preference. It 
simply advises a method for increasing vigilance against 
discrimination. The processing guidelines, for their part, 
clearly do not require that a station exercise a racial hiring 
preference, but only set the conditions under which some 
further inquiry into a station's hiring practices might occur.

 The panel claimed that the mere possibility that the racial 
composition of a station's workforce might play a role in 
subjecting a station to the burden of a "government audit" 
makes the guidelines into a preferential racial classification. 
But this argument makes no sense in light of decisions, such 
as Texas Dep't Community Affairs v. Burdine, 450 U.S. 248, 
253-54 (1981) (test for prima facie case with respect to a 
disparate treatment claim under Title VII) and Connecticut v. 
Teal, 457 U.S. 440 (1982) (non-proportionality in the selection 
process can be the basis of a "disparate impact" claim under 
Title VII), setting forth the standards governing the estab-
lishment of a prima facie case of employment discrimination 
under Title VII. See also 42 U.S.C. s 2000e-2(k) (1994) 
(setting forth burden of proof in disparate impact cases). 
The Burdine and disparate impact frameworks show defini-
tively that no suspect "racial classification" need arise simply 
because the law dictates that an employer might have to 
explain, on pain of sanction, why its hiring decisions were 
nondiscriminatory.


 Under Burdine, when a protected minority plaintiff shows 
by a preponderance of the evidence that he or she was denied 
employment despite being qualified, and that the position 
remained unfilled, the burden of production shifts to the 
employer-defendant to show that the hiring decision was 
nondiscriminatory. See 450 U.S. at 253-54. In other words, 
Burdine allows the race of just one applicant to play a crucial, 
even determinative, part in requiring an employer to respond 
in litigation and justify its actions. "[T]he prima facie case 
'raises an inference of discrimination only because we pre-
sume these acts, if otherwise unexplained, are more likely 
than not based on the consideration of impermissible fac-
tors.' " Id. at 254 (emphasis added) (quoting Furnco Constr. 
Corp. v. Waters, 438 U.S. 567, 577 (1978)).

 As the Supreme Court noted in establishing this frame-
work, "[t]he burden of establishing a prima facie case of 
disparate treatment is not onerous." Burdine, 450 U.S. at 
253. Yet, the Burdine framework certainly does not impli-
cate strict scrutiny. The FCC's processing guidelines use 
race in an even less instrumental way: a numerical disparity 
between a station's employees and the relevant workforce is 
simply one factor among several in the Commission's determi-
nation of whether further investigation (not litigation) is 
required.

 In light of the statutory mandates that we routinely enforce 
under Title VII, both with respect to "disparate treatment" 
and "disparate impact" cases, see, e.g., Koger v. Reno, 98 F.3d 
631, 633-34, 639 (D.C. Cir. 1996) (applying and explaining 
disparate treatment and disparate impact standards), it is 
hard to comprehend a suggestion that the disputed FCC 
guidelines and regulations implicate strict scrutiny. A race-
based analysis may play a part in the Commission's decision 
to launch an investigation to which a station would have to 
respond. But it does not follow that the burden of a potential 
investigation "obliges" a station to engage in unlawful hiring 
preferences, any more than the Burdine burden-shifting 
obliges employers generally to engage in preferential hiring 
in order to avoid ever facing the requirement of justifying 
their employment decisions as nondiscriminatory. Plainly, 
race may be a factor in requiring a party to explain its actions 
without triggering strict scrutiny.

 In the opinion denying the petition for rehearing, the panel 
suggests that the analogy to Title VII is inapposite, because 
"the statute does not encourage employers to impose racial 
preferences in order to avoid Title VII liability." The same 
can be said here about the regulations and processing guide-
lines, for neither requires nor encourages employers to exer-
cise racial hiring preferences. The panel decision on rehear-
ing seeks to avoid the analogy to Title VII by citing a 
provision in the statute that says, "[n]othing contained in 
[Title VII] shall be interpreted to require any employer ... 
to grant preferential treatment to any individual or to any 
group because of [ ] race...." See 42 U.S.C. s 2000e-2j 
(1994). I take it from this that the Commission's regulations 
would have survived judicial scrutiny had the agency foreseen 
the need to parrot this passage from Title VII. When the 
case is returned to the agency, the Commission should consid-
er amending the regulations to add the Title VII caveat. It 
seems obvious to me that the regulations and guidelines as 
presently written do not require or encourage racial prefer-
ences, but, if that point needs further clarification, it is easily 
achieved.

 The panel decision seems to be of the view that any policy 
that leads an employer to be conscious of race while making 
hiring decisions demands strict scrutiny. I think this is 
incorrect as a matter of law and logic: a person who is being 
scrupulously and self-consciously careful not to be racist in a 
hiring decision is certainly "conscious of" race--but in a 
positive way. To think otherwise is to confuse the aspiration 
to color-blindness with the reality that today, whether we like 
it or not, "race" exists as a social fact. If Congress passed a 
law stating that every federal employer must think twice 
before every hiring decision to make sure he or she was not 
making a racist decision, this law surely would not implicate 
strict scrutiny, even though it would call for self-
consciousness about race.

 Indeed, the processing guidelines may not even aim to 
affect the stations' behavior at all: the guidelines reasonably 
can be understood to provide nothing more than a method for 
allocating the agency's investigative resources. It is hard to 
see how strict scrutiny should apply to the guidelines an 
agency uses to decide when to look closely at whether its 

licensees are complying with the law. This is especially true 
when no infringement on the rights of the licensee is implicat-
ed by the closer investigation. The Commission cannot inves-
tigate every station in the country to see if it is discriminating 
in its hiring. The agency must allocate its investigative 
resources somehow. One inexpensive, nondiscriminatory way 
for it to make the initial cut is to look at the numbers of 
minorities hired relative to the number of minorities in the 
general area. That is all that the processing guidelines 
actually do. 

 Because there is no racial classification in these guidelines 
or regulations, Adarand does not apply. The panel's consti-
tutional analysis was therefore entirely unwarranted. The 
panel here essentially disagreed as a matter of policy with the 
use of statistical comparison as a method of targeting more 
careful investigation. There may be reasons for such a 
disagreement, but they are not of constitutional magnitude. 
Because Adarand simply does not cover this case, its applica-
tion--which allows the panel to second-guess the Commission 
on agency policies--is misplaced.

 * * *

 Beyond its misapplication of Adarand to the regulations 
and guidelines at issue in this case, the panel here subjected 
the term "diversity" to a rhetorical attack which, in my view, 
misstated the limited way in which the concept of "diversity" 
functions in this case. See 141 F.3d at 356. Depending on 
context, the term "diversity" can have several meanings, only 
one of which actually applies here. The only meaning that 
might be relevant here is that of "programming diversity," 
the justification offered by the Commission for its equal 
employment opportunity regulations, endorsed by the Su-
preme Court in Metro Broad., Inc. v. FCC, 497 U.S. 547 
(1990), and not overruled by the Court in Adarand.

 A second, largely unrelated meaning of "diversity," is the 
use of racial and gender diversity in the workplace as either a 
relevant datum for making an initial determination of whether 
employment discrimination is occurring, or, alternatively, as a 
tool for promoting important social goals. This second type 
of diversity is not at issue in this case, because the Commis-
sion has not cited workplace diversity in itself as its justifica-
tion for equal employment opportunity programs.

 Unfortunately, the panel decision seems to conflate the 
several meanings of "diversity." The panel decision thus 
broadly deplores the

 burden the term 'diversity' has been asked to bear in the 
 latter part of the 20th century in the United States[,] 
 [claiming that] it appears to have been coined both as a 
 permanent justification for policies seeking racial propor-
 tionality in all walks of life ("affirmative action" has only 
 a temporary remedial connotation) and as a synonym for 
 proportional representation itself.

141 F.3d at 356. This argument may be relevant to the 
ongoing debates in our society over "affirmative action;" but I 
do not understand what this message has to do with the 
instant case.

 The panel decision does not appear to doubt for an instant 
that, absent the suggestion that the disputed regulations 
constitute a "racial classification," there is no real constitu-
tional issue at stake here. The panel's references to "strict 
scrutiny" and "intermediate scrutiny," 141 F.3d at 356, are 
irrelevant, because there is no "racial classification" at issue. 
Indeed, given the truly innocuous nature of the regulations, 
proponents of affirmative action might be surprised by the 
suggestion that the FCC equal employment opportunity pro-
gram is seen by some as affording racial preferences. In my 
view, it just isn't so.

 This court hears and decides garden-variety challenges to 
the logic of agencies' justifications for their actions every day 
without reaching constitutional questions. If the Commission 
failed adequately to explain or justify its equal employment 
opportunity program as applied to the station here, the 
proper initial review should have proceeded according to our 
ordinary standards. If the parties failed to join the issue 
correctly, the court should still have declined to address an 
overreaching constitutional challenge. By forcing the square 
peg of the Commission's regulations into the round hole of 
the Adarand analysis, which applies only to racial classifica-
tions, the panel decision disserves the development of anti-
discrimination doctrine. This serious misprision of the issues 
calls for rehearing en banc.

 Separate statement filed by Circuit Judge Tatel, with 
whom Wald, Circuit Judge, concurs, dissenting from the 
denial of rehearing en banc:

 Tatel, Circuit Judge, dissenting from the denial of rehear-
ing en banc: Although the Supreme Court has gradually 
limited governmental affirmative action, first applying strict 
scrutiny to state and local programs in City of Richmond v. 
J.A. Croson Co., 488 U.S. 469 (1989), and then to federal 
programs in Adarand Constructors, Inc. v. Pena, 515 U.S. 
200 (1995), neither the Supreme Court nor any other court 
has ever applied strict scrutiny to programs that require 
nothing more than recruitment, outreach, self-evaluation, and 
data collection. Because the panel has done just that, taking 
Adarand where no court has yet taken it, and because the 
panel could have easily avoided the issue by granting the 
Commission's motion for partial remand of the record, this 
case involves "a question of exceptional importance" warrant-
ing en banc review. Fed. R. App. P. 35(a).

 I

 "[N]ovel" or even "unusual" may well be appropriate de-
scriptions of the Commission's motion to remand. Lutheran 
Church-Missouri Synod v. FCC, 141 F.3d 344, 349 (D.C. Cir. 
1998). But because remand would have mooted this case, 
thus avoiding the need to decide a major constitutional issue, 
the panel should have taken the Commission at face value and 
granted its motion. "If there is one doctrine more deeply 
rooted than any other in the process of constitutional adjudi-
cation, it is that we ought not to pass on questions of 
constitutionality ... unless such adjudication is unavoidable." 
Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 105 
(1944).

 The Commission's motion stated that in light of its new 
Order and Policy Statement issued on February 25, 1998, it 
would "(1) vacat[e] those portions of the Memorandum Opin-
ion and Order, the Initial Decision of the Administrative 
Law Judge and the Decision of the Review Board that relate 
to the EEO issue designated for hearing in this proceeding, 
and (2) unconditionally grant[ ] the Church's applications for 
renewal of its broadcast licenses at issue here." Mot. Partial 

Remand at 1. According to the Commission, this would have 
"moot[ed] all issues in this case" except the lack of candor 
issue, id. at 2--a question not, as the Church claims, "inextri-
cably related" to the affirmative action issue, Opp'n Pets. 
Reh'g and Suggestions for Reh'g In Banc at 5, but which 
instead turned solely on whether the Church had accurately 
characterized its own hiring policies. Commission counsel's 
subsequent notification to the panel that one Commissioner 
would not agree to this result in no way undermined the 
Commission's commitment to vacate its order.

 To be sure, the Commission found the Church's conduct 
defective independently of the Church's Lutheran preference, 
and the Commission's EEO requirements will still apply to 
the Church's future outreach and self-evaluation efforts. But 
none of this is relevant in light of the Commission's declara-
tion that it would vacate all portions of its order dealing with 
the Church's EEO violations and unconditionally grant the 
Church's license renewal. Were the panel to have remanded, 
and were the Commission to make an issue of the Church's 
compliance in a future enforcement proceeding, nothing 
would prevent the Church from challenging the constitution-
ality of the EEO requirements at that time.

 I acknowledge that the Commission's request came well 
after oral argument took place, and that in some cases we 
have held that late filing of such motions precludes remand. 
See Mississippi River Transmission Corp. v. FERC, 969 
F.2d 1215, 1217 n.2 (D.C. Cir. 1992) (motion filed without 
request for leave to file two days before oral argument). But 
late filing made no difference in Steele v. FCC, 770 F.2d 1192 
(D.C. Cir.), vacated, Steele v. FCC, No. 84-1176 (D.C. Cir. Oct 
31, 1985) (en banc), where, as described in Lamprecht v. FCC, 
this court remanded an affirmative action case to the FCC 
not only after a panel had issued a decision, but after the full 
court vacated the panel decision to rehear the case en banc. 
See 958 F.2d 382, 385 (D.C. Cir. 1992) (discussing Steele). In 
its remand motion in Steele, the Commission "acknowledged 
that it thought its race- and sex-preference policies contrary 
to both the Communications Act and the Constitution" and 


advised the court that it wanted to reconsider those policies. 
Id.

 The panel points out that in Steele the Commission's motion 
to remand was supported by the party who had challenged 
the policy. See Panel Op. Den. Reh'g at 4. However, I know 
of no authority supporting the proposition that our deeply 
rooted obligation to avoid unnecessarily adjudicating constitu-
tional questions evaporates simply because the party that 
brought the case desires a decision on the merits. Nor is 
such a notion consistent with Supreme Court precedent. For 
example, in Richardson v. Wright, 405 U.S. 208 (1972) (per 
curiam), the Court, having been notified "[s]hortly before oral 
argument" that the agency had adopted new regulations, 
ruled that "the appropriate course is to withhold judicial 
action pending reprocessing, under the new regulations," 
because if petitioner were to prevail, "there will be no need to 
consider the constitutional claim." Id. at 209. The Court 
reached this conclusion "sua sponte," id. at 212 (Brennan, J., 
dissenting), suggesting that the Justices gave respondent no 
opportunity to express its view on the matter prior to re-
mand. Remand would have been equally appropriate here to 
avoid deciding a major constitutional issue, particularly be-
cause the Commission has not just issued a binding order 
changing its policies, see In re Streamlining Broad. EEO 
Rule and Policies, 13 F.C.C.R. 6322 p 3 (1998) ("This action 
should be considered binding for radio licensees and permit-
tees ...."), but also stated its intent to apply the new policies 
to the Church's case on remand, thus granting it complete 
relief on the EEO issue.

 II

 Turning to the merits, I find nothing in Adarand or any 
other affirmative action case decided by the Supreme Court 
that supports the panel's application of strict scrutiny to the 
Commission's EEO regulations. The panel relies on Ada-
rand for the proposition that strict scrutiny applies to all 
governmental racial classifications, but a careful reading of 
Adarand demonstrates that the target of strict scrutiny is 


"any racial classification subjecting [a] person to unequal 
treatment." 515 U.S. 200, 224 (1995) (emphasis added). Not 
only does the language of Adarand make clear that its 
precise concern is governmental action that "treat[s] people 
differently because of their race," id. at 227; see also id. at 
228 (strict scrutiny applies to "unequal treatment based on 
race"), but the facts of Adarand presented the Court with a 
racial classification that squarely produced unequal treat-
ment: Adarand involved a government program that gave 
financial bonuses to contractors who utilized minority subcon-
tractors, thus directly enhancing the competitive position of 
minority-owned firms relative to non-minority-owned firms in 
bidding for subcontracts. See id. at 205-10.

 In each major affirmative action case discussed in Ada-
rand, moreover, unequal treatment based on race served as 
the trigger for strict scrutiny. In City of Richmond v. J.A. 
Croson Co., city policy required prime contractors to subcon-
tract at least 30 percent of the contract award to minority-
owned businesses. See 488 U.S. 469 (1989). In Wygant v. 
Jackson Board of Education, a school board used racial 
preferences in determining which teachers to lay off. See 476 
U.S. 267 (1986). And in Regents of the University of Califor-
nia v. Bakke, a state medical school reserved 16 out of 100 
places in the entering class for minority students and evaluat-
ed minority applicants through a separate process using 
admissions criteria different from those used for white appli-
cants. See 438 U.S. 265 (1978).

 Properly read, therefore, Adarand does not require strict 
judicial scrutiny of all race-conscious measures adopted by 
the government. Indeed, a vast range of antidiscrimination 
laws, including Title VII, require public and private entities to 
be conscious of race not only in outreach and recruitment, but 
also in hiring and promotion. Surely such laws do not 
implicate strict scrutiny. What triggers strict scrutiny, then, 
is not mere race-consciousness, but rather unequal treatment 
based on race.

 In this case, I am at a loss to understand how the Commis-
sion's regulations give rise to unequal treatment based on 


race. By their own terms, the regulations require no "use[ ] 
of race in governmental decisionmaking" as in Adarand. 515 
U.S. at 228. Instead, they merely require broadcasters to 
eliminate discriminatory practices, to expand the pool from 
which they hire, and to keep adequate records. Nothing in 
the regulations' outreach provisions, see 47 C.F.R. 
s 73.2080(c)(2) (1997) (requiring stations to target sources for 
minority applicants); id. s 73.2080(c)(5) (requiring stations to 
analyze their efforts to recruit, hire, and promote minorities), 
either directs stations to hire anyone on the basis of race or 
requires stations to maintain any specific racial balance. Nor 
do the regulations confer or withhold benefits upon anyone on 
racial grounds. The regulations simply require that "licen-
sees make efforts to recruit minority and women applicants 
so that they will be ensured access to the hiring process." In 
re Benchmark Radio Acquisition Fund IV Limited Partner-
ship, 11 F.C.C.R. 8547 p 3 (1996). Indeed, nothing in the 
regulations prevents stations from evaluating job applicants 
solely on the basis of individual merit. At least one other 
court has characterized such outreach programs as race-
neutral. See Peightal v. Metropolitan Dade County, 26 F.3d 
1545, 1557-58 (11th Cir. 1994) (describing school recruitment 
programs targeted at minorities and outreach programs led 
by minority employees as race-neutral).

 The panel responds by pointing out that the regulations in 
Adarand, like the Commission's regulations here, "did not 
require or obligate" private entities to adopt a racial prefer-
ence, but merely "provided a financial incentive to bidding 
contractors to grant such a preference." Panel Op. Den. 
Reh'g at 8. "Nonetheless," according to the panel, "the 
Supreme Court treated the regulations as a racial classifica-
tion, and did not even pause to consider the suggestion that 
the absence of a compelled racial preference makes strict 
scrutiny inapposite." Id. at 9. In Adarand, however, the 
core of the equal protection challenge was not that the system 
of bonuses provided an incentive for prime contractors to 
grant a racial preference in subcontracting, but that the 
bonuses directly put minority-owned subcontractors in a more 
competitive bidding position than non-minority-owned subcon-


tractors. Adarand would control this case if the Commis-
sion's regulations put minority job applicants in a better 
position than non-minority applicants. But the regulations do 
no such thing. Indeed, they do not even offer incentives for 
licensees to prefer minority over non-minority job applicants. 
Stations with inadequate outreach programs cannot protect 
themselves from enforcement actions by preferring minorities 
in order to meet the 50% parity goal. See In re Kelly 
Communications, Inc., 12 F.C.C.R. 17,868 pp 11-13 (1997). 
And stations with adequate outreach programs face no sanc-
tions for failing to reach specific numerical levels of minority 
hiring. See In re Louisiana Broadcast Stations, 7 F.C.C.R. 
1503 pp 16-19 (1992) (holding that station complied with EEO 
rule based on its minority recruitment efforts despite failing 
to hire any minorities); In re Miami Broadcast Stations, 5 
F.C.C.R. 4893 WW 13-17 (1990) (holding that station complied 
with EEO rule despite statistical disparity between new 
minority hires and minorities in local labor force, and declar-
ing that "failing to meet the Commission's processing guide-
lines does not in and of itself demonstrate the inadequacy of a 
licensee's EEO efforts. The Commission instead focuses on a 
station's overall efforts to recruit, hire and promote minori-
ties.") (citation omitted). Because minority hiring is neither 
necessary nor sufficient for a finding of compliance with the 
Commission's regulations, I find it difficult to understand how 
the panel could have concluded that the regulations "indisput-
ably" encourage licensees to use racial hiring preferences. 
Simply put, the regulations here do not produce the kind of 
direct discriminatory treatment that occurred in Adarand, 
Croson, Wygant, or Bakke.

 All but conceding that the regulations by their terms 
mandate no hiring preferences, the panel, pointing to the 
requirement that stations evaluate their employment profile 
against the availability of women and minorities in their 
recruiting areas, see 47 C.F.R. s 73.2080(c)(3), insists that the 
EEO regulations "certainly influence ultimate hiring deci-
sions." Lutheran Church, 141 F.3d at 351. But nothing in 
the record supports this assumption; indeed, the Church does 
not even claim that the regulations "influence" its hiring 
decisions.


 The panel says that because "evidence of actual discrimina-
tion would not be required before applying strict scrutiny" in 
cases involving racial quotas, "there is no logical reason why 
it should be required here." Panel Op. Den. Reh'g at 11. 
While it is certainly true that courts have not required 
evidence of discrimination before applying strict scrutiny in 
quota cases, the reason is not that they view it as irrelevant 
or unnecessary, but rather that in such cases the connection 
between the regulatory requirements and the resulting un-
equal treatment has always been so obvious and well-
documented that an overt evidentiary requirement would be 
superfluous. See, e.g., Croson, 488 U.S. at 481-83 (document-
ing the differential treatment of minority versus non-minority 
subcontractors under Richmond's set-aside requirement); 
Wygant, 476 U.S. at 270-72 (documenting the differential 
treatment of minority versus non-minority teachers under the 
Jackson Board's layoff policy); Bakke, 438 U.S. at 272-78 
(documenting the differential treatment of minority versus 
non-minority applicants under the Davis medical school's 
racial quota). Given the evidence of discriminatory treatment 
in Croson, Wygant, and Bakke, I do not agree that requiring 
evidence of discrimination in this case would "turn equal 
protection analysis inside out." Panel Op. Den. Reh'g at 11. 
I know of no equal protection case in which a court has 
shifted the burden of justifying a regulatory scheme to the 
government without first determining that the scheme has 
actually effected some form of unequal treatment. Where, as 
here, the existence of discriminatory treatment is far from 
obvious, we should insist on something more than unsupport-
ed speculation about the effect of challenged regulations 
before subjecting them to strict scrutiny.

 I respectfully dissent from the denial of the suggestions for 
rehearing en banc.