**MD/DC/DE BROADCASTERS ASSOCIATION, et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

Minority Media and Telecommunications Council, et al., Intervenors

Nos. 00–1094, 00–1198.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 29, 2000.

Decided Jan. 16, 2001.

Barry H. Gottfried argued the cause for petitioners State Broadcasters Associations. With him on the briefs were Richard R. Zaragoza and Kathryn R. Schmeltzer. David D. Oxenford, Jr. entered an appearance.

Shelby D. Green argued the cause and filed the briefs for petitioner Office of Communication, Inc., United Church of Christ.

Christopher J. Wright, General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Daniel M. Armstrong, Associate General Counsel, C. Grey Pash, Jr., Counsel, Bill L. Lee, Assistant Attorney General, U.S. Department of Justice, and Lisa W. Edwards, Attorney.

David Earl Honig, Elliot M. Mincberg, Frederick C. Schafrick and Thomas J. Mikula were on the brief for intervenors Minority Media and Telecommunications Council, et al.

Angela J. Campbell was on the brief for intervenor National Organization for Women, et al.

Tom W. Davidson, Daniel L. Brenner, Neal M. Goldberg, Michael S. Schooler, David L. Nicoll, Dominique T. Bravo, Richard B. Nettler and Charles A. Hunni-

cutt were on the brief for amici curiae Radio One, Inc. et al. Thomas P. Powers and Anthony T. Pierce entered appearances.

Julie Nepveu and Theodore C. Whitehouse were on the brief for amici curiae The Leadership Conference on Civil Rights and National Council of the Churches of Christ. Andrew J. Schwartzman entered an appearance.

Christopher M. Curran and Eduardo Pena were on the brief for amicus curiae Congressional Black Caucus.

Before: GINSBURG, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Fifty state broadcasters associations (Broadcasters) petition for review of an Equal Employment Opportunity (EEO) rule promulgated by the Federal Communications Commission. The Broadcasters argue that the rule violates: (1) the Administrative Procedure Act by creating an arbitrary and capricious reporting burden; and (2) the equal protection component of the Due Process Clause of the Fifth Amendment to the Constitution of the United States by granting preferences to women and minorities. The United Church of Christ (UCC) petitions for review of the same EEO rule, arguing that it violates the APA because, without giving a reasoned explanation, the agency changed its policy of requiring broadcasters to recruit women and minorities.

We hold first that the Broadcasters fail to substantiate their claim that the rule is arbitrary and capricious. We further hold that the rule does put official pressure upon broadcasters to recruit minority candidates, thus creating a race-based classification that is not narrowly tailored to support a compelling governmental interest and is therefore unconstitutional. Because we find that the unconstitutional portion of

the rule is not severable, we vacate the rule in its entirety and dismiss the petition of the UCC as moot.

## I. Background

The Federal Communications Commission draws its authority to issue EEO rules from the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, which authorizes the Commission, in considering whether to grant a license or renewal to a broadcast station, to determine "whether the public interest, convenience, and necessity will be served by the granting of such application." *Id.* at § 309(a). In 1969 the Commission determined that it would not serve the public interest to grant licenses to broadcasters with discriminatory hiring practices. The Commission therefore prohibited licensees from discriminating in employment on the basis of race or sex and required them to establish EEO programs. *See Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices*, 18 F.C.C.2d 240, 1969 WL 16274 (1969). In 1992 the Congress prohibited the Commission from "revis[ing] ... the regulations concerning equal employment opportunity ... as such regulations apply to television broadcast station licensees." 47 U.S.C. § 334(a)(1).

The regulations then in effect required all broadcast licensees—both radio and television stations—not only to refrain from invidious discrimination but also to "establish, maintain, and carry out a positive continuing program of specific practices designed to ensure equal opportunity and nondiscrimination in every aspect of station employment policy and practice." 47 C.F.R. § 73.2080(b). The regulations required stations to seek out sources likely to refer female and minority applicants for employment, to track the source of each referral, and to record the race and sex of each applicant and of each person hired. If these data indicated that a station employed a lower percentage of women and minorities than were employed in the local

workforce, then the Commission would take that into account in determining whether to renew the station's license.

In *Lutheran Church–Missouri Synod v. FCC*, 141 F.3d 344 (D.C.Cir.1998), we held that the Commission's EEO rule was an unconstitutional race-based classification. (The question whether the rule was an unconstitutional sex-based classification was not before the court.) We held first that the rule was subject to strict constitutional scrutiny because it was "built on the notion that stations should aspire to a workforce that attains, or at least approaches, proportional [racial] representation" and "oblige[d] stations to grant some degree of preference to minorities in hiring." *Id.* at 352–53. We further held that the Commission's sole rationale for its rule, promoting "diversity of programming," was not a compelling governmental justification; the Commission had expressly abjured preventing employment discrimination as a goal of its EEO regulation. *Id.* at 354–55. Accordingly, we remanded the matter to the Commission to determine whether it had a compelling governmental interest (such as the Justice Department had urged as an amicus curiae, in preventing discrimination) to support its regulation of employment practices in the broadcast industry. *Id.* at 356.

On remand, the Commission suspended the EEO rule in its entirety and issued a Notice of Proposed Rulemaking soliciting comments on a draft replacement rule. *Review of the Commission's Broadcast Equal Employment Opportunity Rules and Policies*, 13 F.C.C.R. 23004, 1998 WL 804683 (1999). Following the comment period the Commission concluded that word-of-mouth recruiting was the single greatest barrier to equal employment in the broadcast industry because it tends to replicate the current composition of the workforce. Accordingly, the Commission issued a new EEO rule requiring licensees to achieve a "broad outreach" in their recruiting efforts. *Review of the Commission's Broad-*

cast *Equal Employment Opportunity Rules and Policies,* 15 F.C.C.R. 2329, ¶ 3, 2000 WL 124381 (2000) (R&O). To this end, the new EEO rule states that a licensee must make a good faith effort to disseminate widely any information about job openings and, in order to "afford[ ] broadcasters flexibility in designing their EEO programs," the rule allows them to select either of two options entailing "supplemental measures" for accomplishing that goal. R&O at ¶ 78. Under Option A the licensee (if it has more than ten employees) must undertake four approved recruitment initiatives in each two-year period; qualifying initiatives are specified by the Commission in some detail, as can be seen from the list reproduced in the margin.* A licensee that selects Option A need not report the race and sex of job applicants. Under Option B the licensee may design its own outreach program but must report the race and sex of each job applicant and the source by which the applicant was referred to the station. *See* 47 C.F.R. § 73.2080(d).

In addition, the new EEO rule reinstates the requirement that each licensee file an Annual Employment Report. *See* 47 C.F.R. § 73.2080(i). That report, the filing of which the Commission had suspended following the decision in *Lutheran Church,* requires the station to identify each employee by race and sex. The Commission stated that it would use the data from the Annual Employment Reports only to monitor industry trends and not (as it had under the prior EEO rule) to screen renewal applications or to assess a licensee's compliance with its EEO obligations. R&O at ¶ ¶ 6, 225–226.

The United Church of Christ filed a petition to review the new EEO rule in the Second Circuit. The Broadcasters filed a petition for review in this court. The Second Circuit transferred the UCC's petition here and the two cases were consolidated.

## II. Analysis

The Broadcasters argue that the new EEO rule favors women and minorities and, in so doing, is arbitrary and capricious as well as unconstitutional. The UCC argues that the new rule is arbitrary and capricious because the Commission departed, without explanation, from its prior policy of requiring broadcasters to recruit women and minorities.

### A. *The Broadcasters' statutory claim*

■ The Broadcasters argue the new rule is arbitrary and capricious for two

---

* (i) Participation in at least four job fairs . . .;

(ii) Hosting of at least one job fair;

(iii) Co-sponsoring at least one job fair with organizations . . . whose membership includes substantial participation of women and minorities;

(iv) Participation in at least four events sponsored by organizations representing groups . . . interested in broadcast employment . . .;

(v) Establishment of an internship program designed to assist members of the community to acquire skills needed for broadcast employment;

(vi) Participation in job banks, internet programs, and other programs designed to promote outreach generally . . .;

(vii) Participation in scholarship programs designed to assist students interested in pursuing a career in broadcasting;

(viii) Establishment of training programs designed to enable station personnel to acquire skills that could qualify them for higher level positions;

(ix) Establishment of a mentoring program for station personnel;

(x) Participation in at least four events or programs sponsored by educational institutions relating to career opportunities in broadcasting;

(xi) Sponsorship of at least two events . . . designed to inform and educate members of the public as to employment opportunities in broadcasting;

(xii) Listing of each upper-level category opening in a job bank or newsletter of media trade groups whose membership includes substantial participation of women and minorities;

(xiii) Participation in other activities . . . reasonably calculated to further the goal of disseminating information as to employment opportunities in broadcasting to job candidates who might otherwise be unaware of such opportunities.

47 C.F.R. § 2080(c)(2).

reasons, neither of which is persuasive. The Broadcasters first attack the Commission's claim, in the preamble to the new rule, that the rule will promote "programming diversity," R&O at ¶ 4; they point out that this court questioned the legitimacy of such a goal in *Lutheran Church. See* 141 F.3d at 354 ("We doubt ... that the Constitution permits the government to take account of racially based differences [in tastes or opinions], much less encourage them"). On review, however, the Commission acknowledges the constitutional cloud over "programming diversity" as a justification for making race a consideration in employment and states that its primary and assertedly sufficient goal in issuing the EEO rule was to prevent invidious discrimination. The preamble to the rule supports the Commission's point. *See* R&O at ¶ 4 (noting that nondiscrimination goals "would be sufficient in themselves to warrant" the rule). The Broadcasters' attack on the rule as an effort to promote diversity in programming is beside the point, therefore.

■ The Broadcasters next contend that the new EEO rule arbitrarily and capriciously increases the "regulatory burden" on stations: Under the old rule "broadcasters filed only nine reports in each eight year license term, while the [new regulations] require broadcast licensees to prepare and file *twenty-one* reports during a license term." The Broadcasters also argue that the Commission acted arbitrarily and capriciously in eliminating the exemption from filing for stations in areas where minorities are a small percentage of the workforce. In response, the Commission states first that despite the increased number of reports, the time and effort required to complete them has decreased. In their reply the Broadcasters do not disagree and we take the Commission's point as conceded. Second, the Commission reasonably explains that it eliminated the filing exemption in areas with a low percentage of minority group members in the workforce because it no longer takes

enforcement action against broadcasters that indicate in their Annual Reports that they have a "low" percentage of minority employees. The Commission's explanation is reasonable; hence the Broadcasters have not shown that the new rule creates an arbitrary and capricious regulatory burden.

B. *The Broadcasters' constitutional challenge*

The Broadcasters argue next that the new EEO rule puts official pressure on them to favor minorities in the hiring process. This pressure, they claim, violates the Fifth Amendment because it employs a race-based classification that does not withstand strict scrutiny.

1. *Does the rule require recruitment or hiring of women and minorities?*

The Broadcasters argue that the new EEO rule requires them to recruit and to hire women and minorities. Because we conclude that the rule does create pressure to recruit women and minorities, which pressure ultimately does not withstand constitutional review, we do not reach the question whether the rule creates pressure to hire those women and minorities who are recruited.

■ For purposes of their constitutional challenge, the Broadcasters focus upon application of the EEO rule to minorities. The Broadcasters argue that both Option A and Option B of the new rule pressure them to recruit minorities. In fact, however, only Option B actually seems to create such pressure. Under Option A, a licensee is not required to report the race or sex of job applicants or interviewees. Instead, the licensee selects from a list of 13 types of recruitment measures, only two of which pay special attention to women and minorities. (Those two measures provide that a licensee may "co-sponsor[ ] at least one job fair with," or list "each upper-level category opening in a job bank or newsletter of," organizations "whose membership includes substantial participation of women and mi-

norities." 47 C.F.R. § 73.2080(c)(2) (iii) and (xii)). Because, as the Commission points out, licensees remain free under Option A to select recruitment measures that do not place a special emphasis upon the presence of women and minorities in the target audience, we do not believe the Broadcasters are meaningfully pressured under Option A to recruit women and minorities.

Option B, however, as FCC Commissioner Furchtgott–Roth pointed out in his dissent from the EEO rule, clearly does create pressure to focus recruiting efforts upon women and minorities in order to induce more applications from those groups. Licensees selecting Option B must report the race, sex, and source of referral for each applicant. *See* 47 C.F.R. § 73.2080(d)(1). The Commission made clear, moreover, in adopting the rule, that "[i]f the data collected does [sic] not confirm that notifications are reaching the entire community, we expect a broadcaster to modify its program as warranted so that it is more inclusive." R&O at ¶ 104. In determining whether recruitment efforts have reached the "entire community," the Commission considers the number of women and minorities in the applicant pool. If a licensee reports "few or no" women and minorities in its applicant pool, then the Commission will investigate the broadcaster's recruitment efforts. *Id.* at ¶ 120.

A regulatory agency may be able to put pressure upon a regulated firm in a number of ways, some more subtle than others. The Commission in particular has a long history of employing:

> a variety of *sub silentio* pressures and "raised eyebrow" regulation of program content . . . . The practice of forwarding viewer or listener complaints to the broadcaster with a request for a formal response to the FCC, the prominent speech or statement by a Commissioner or Executive official, the issuance of notices of inquiry . . . all serve as means for communicating official pressures to the licensee.

*Community–Service Broadcasting of Mid–America, Inc. v. FCC,* 593 F.2d 1102, 1116 (D.C.Cir.1978) (en banc); *cf. Writers Guild of America v. American Broadcasting Co., Inc.,* 609 F.2d 355, 365–66 (9th Cir.1979) (noting that "the line between permissible regulatory activity and impermissible 'raised eyebrow' harassment of vulnerable licensees is . . . exceedingly vague").

Under Option B the Commission promises to investigate any licensee that reports "few or no" applications from women or minorities. Investigation by the licensing authority is a powerful threat, almost guaranteed to induce the desired conduct. *See Chamber of Commerce v. Department of Labor,* 174 F.3d 206, 210 (D.C.Cir.1999) (noting that agency "is intentionally using the leverage it has by virtue solely of its power to inspect. The Directive is therefore the practical equivalent of a rule that obliges an employer to comply or to suffer the consequences; the voluntary form of the rule is but a veil for the threat it obscures"); *see also* BARRY COLE & MAL OETTINGER, RELUCTANT REGULATORS 213 (1978) (investigatory hearing before FCC "is considered by both key staff people and most commissioners almost as drastic as taking a license away").

Indeed, the Commission's focus upon the race and sex of applicants belies its statement—or so a licensee reasonably might (and prudently would) conclude—that its only goal is that licensees recruit with a "broad outreach." *See Lutheran Church,* 141 F.3d at 353. Were that the Commission's only goal, then it would scrutinize the licensee's outreach efforts, not the job applications those efforts generate. Measuring outputs to determine whether readily measurable inputs were used is more than self-evidently illogical; it is evidence that the agency with life and death power over the licensee is interested in results, not process, and is determined to get them. As a consequence, the threat of being investigated creates an even more powerful incentive for licensees to focus their recruiting efforts upon women and

minorities, at least until those groups generate a safe proportion of the licensee's job applications.*

## 2. *The level of scrutiny*

■ With respect to minorities, the Broadcasters argue that the court should give strict constitutional scrutiny to the recruiting requirement. The Commission's position is that, unlike affirmative action in hiring, "affirmative outreach" in recruitment does not implicate equal protection concerns because it merely expands the applicant pool, and an individual applicant has no right to compete against fewer rivals for a job.

In *Adarand Constructors, Inc. v. Pena*, the Supreme Court held that "any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." 515 U.S. 200, 224, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). The question before the court today, therefore, is whether a government mandate for recruitment targeted at minorities constitutes a "racial classification" that subjects persons of different races to "unequal treatment." We expressly reserved this question in *Lutheran Church–Missouri Synod v. FCC*, 154 F.3d 487, 492 (1998), *denying reh'g in Lutheran Church*, 141 F.3d 344 ("Whether the government can encourage—or even require—an outreach program specifically targeted on minorities is, of course, a question we need not decide").

Among our sister circuits only one has heretofore considered the level of constitutional scrutiny applicable to affirmative outreach, and even that decision has since been vacated. *See Allen v. Alabama State*

*Board of Education*, 164 F.3d 1347 (11th Cir.1999), *vacated by* 216 F.3d 1263 (11th Cir.2000); *cf. Safeco Ins. Co. of America v. City of White House*, 191 F.3d 675, 692 (6th Cir.1999) ("Outreach efforts may or may not require strict scrutiny"). In *Allen* the Eleventh Circuit held that "where the government does not exclude persons from benefits based on race, but chooses to undertake outreach efforts to persons of one race broadening the pool of applicants, but disadvantaging no one, strict scrutiny is generally inapplicable." *Id.* at 1352; *see also Sussman v. Tanoue*, 39 F.Supp.2d 13, 27 (D.D.C.1999) (noting that program "does not create preferences in hiring based on race or gender, and therefore need not be examined under strict scrutiny"). In a footnote, the Eleventh Circuit observed that there is some suggestion in *Adarand* "that all race-based actions, whether or not they lead to unequal treatment, are subject to strict scrutiny. *See Adarand*, 515 U.S. at 227, 115 S.Ct. 2097. Courts, however, have not accepted this broad reading of *Adarand*." 164 F.3d at 1352 n. 2 (citing *Lutheran Church*; *Raso v. Lago*, 135 F.3d 11, 16 (1st Cir.1998); *Monterey Mechanical Co. v. Wilson*, 125 F.3d 702, 711 (9th Cir.1997)).

We may assume, with the Eleventh Circuit, that *Adarand* requires strict scrutiny only of governmental actions that lead to people being treated unequally on the basis of their race. We nonetheless disagree with that court's (short-lived) conclusion that preferential recruiting "disadvantag[es] no one." 164 F.3d at 1352.

Under Option B the Commission has compelled broadcasters to redirect their necessarily finite recruiting resources so as to generate a larger percentage of applications from minority candidates.** As

---

* Significantly, the Commission does not argue that Option B creates no pressure to recruit women and minorities because a licensee could always elect Option A. That argument would be inconsistent with the fundamental structure of the rule. *See* Part II.B.4.

** Recruiting expenditures are fixed in the short run; even if an employer increases its recruiting budget in response to the Commission's EEO rule, it then must follow the Commission's directive in determining how to allocate those funds. Here, the purpose of the rule is to raise the percentage of women and minori-

a result, some prospective nonminority applicants who would have learned of job opportunities but for the Commission's directive now will be deprived of an opportunity to compete simply because of their race. While the Commission's intentions are to benefit minorities rather than to disadvantage non-minorities, *Adarand* clearly holds that the standard of constitutional review does not turn upon the race of those benefitted by a particular government action. *See Adarand,* 515 U.S. at 224, 115 S.Ct. 2097.

The Commission has designed a rule under which nonminorities are less likely to receive notification of job openings solely because of their race; that the most qualified applicant from among those recruited will presumably get the job does not mean that people are being treated equally—that is, without regard to their race—in the qualifying round. The new rule is therefore subject to strict scrutiny for compliance with the constitutional requirement that all citizens receive equal protection under the law.

3. *Does the rule survive strict scrutiny?*

■ For a government action to withstand strict scrutiny it must "serve a compelling governmental interest, and must be narrowly tailored to further that interest." *Adarand,* 515 U.S. at 235, 115 S.Ct. 2097. The Broadcasters fault the new EEO regulations in both respects.

■ The matter of a compelling governmental interest is somewhat vexed. Echoing their earlier claim that the new rule is arbitrary and capricious because the Commission lacks a proper goal, the Broadcasters again focus primarily upon the Commission's secondary goal of promoting "programming diversity," which we rejected in *Lutheran Church.* With respect to the Commission's primary motivation, the Broadcasters offer only the conclusory assertion that "deterring imaginable future discrimination is not a compelling governmental interest." The Government responds by asserting that it has a compelling interest both in remedying the effects of past discrimination and in preventing future discrimination in the distribution of public benefits. *See, e.g., Roberts v. United States Jaycees,* 468 U.S. 609, 628, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). But the Government's remedial interest is compelling only with respect to "identified discrimination," *see Shaw v. Hunt,* 517 U.S. 899, 909, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996), and it is far from clear that future employment in the broadcast industry is a public benefit for which the Government is constitutionally responsible. *Cf. Burton v. Wilmington Parking Authority,* 365 U.S. 715, 724, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (holding that racial discrimination by private restaurant located in public parking garage "indicates that degree of state participation and involvement which it was the design of the Fourteenth Amendment to condemn").

We need not resolve the issue of a compelling governmental interest in preventing discrimination, however, because the Broadcasters argue convincingly that the new EEO rule is not narrowly tailored to further that interest. First, Option B places pressure upon each broadcaster to recruit minorities without a predicate finding that the particular broadcaster discriminated in the past or reasonably could be expected to do so in the future. Quite

---

ties in the applicant pool and, thereby, increase their chances of being hired. *See, e.g.,* R&O at ¶ 164 ("an increase in the number of women and minorities employed would indicate that our EEO requirements are effective in ensuring outreach"). If an employer believed that it could reach the maximum number of good prospects with a display ad in the local newspaper, but they would likely be

non-minorities, then it nonetheless would choose to run a smaller newspaper ad and use its remaining funds to run an ad in a publication targeted at minorities. This redirection of resources hurts those prospective non-minority applicants who would respond to the display ad but not to the smaller ad, and it does so only because of their race.

apart from the question of a compelling governmental interest, such a sweeping requirement is the antithesis of rule narrowly tailored to meet a real problem. *Cf., e.g., City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 508, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (noting that City's "interest in avoiding the bureaucratic effort necessary to tailor remedial relief . . . cannot justify a rigid line drawn on the basis of a suspect classification").

The requirement in Option B that licensees report the race of each applicant is another departure from the norm of narrow tailoring and a corollary, no doubt, of the Commission's true interest in results rather than mere outreach. The race of each job applicant is relevant to the prevention of discrimination only if the Commission assumes that minority groups will respond to non-discriminatory recruitment efforts in some predetermined ratio, such as in proportion to their percentage representation in the local workforce. Any such assumption stands in direct opposition to the guarantee of equal protection, however. *See Lutheran Church,* 141 F.3d at 352 (noting that Commission's claim that its goal of proportional representation was equivalent to goal of nondiscrimination "presupposes that non-discriminatory treatment typically will result in proportional representation in a station's workforce. The Commission provides no support for this dubious proposition"); *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 602, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (O'Connor, J., dissenting) ("At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual, or national class"). The racial data required by Option B simply are not probative on the question of a licensee's efforts to achieve "broad outreach," much less narrowly tailored to further the Commission's stated goal of nondiscrimination in the broadcast industry. Because Option B of the new EEO rule is not narrowly tailored, it does not with-

stand strict scrutiny, and we hold that it violates the equal protection component of the Due Process Clause of the Fifth Amendment.

### 4. *Severability*

In light of our holding that Option B is unconstitutional with respect to minorities, we must address the Commission's request that we sever the unconstitutional aspects and leave the rest of the new EEO rule in place. Whether the offending portion of a regulation is severable depends upon the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision. *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 294, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). Here, the Commission clearly intends that the regulation be treated as severable, to the extent possible, for it said so in adopting the regulation. R&O at ¶ 232. The question for the court, then, is whether the balance of the rule can function independently if shorn of its unconstitutional aspects.

The core of the rule, by Commission design, is to provide broadcasters with two alternatives. As the Commission explained in the report adopting the rule, its goal is to "ensur[e] broad outreach while affording broadcasters flexibility in designing their EEO programs" and, to this end, the rule obligates broadcasters to "comply with one of . . . two outreach options." R&O at ¶ 78. The Commission understandably, therefore, did not consider the loss of flexibility that eliminating the "alternative recruitment program" in Option B would entail. Presumably, however, the Commission would not have created Option B if it believed that Option A by itself was sufficient to achieve the Commission's goals. In any event, the court cannot by severing one alternative make the other mandatory; to do so would undercut the whole structure of the rule.

Nor can the court simply cut out all references to "minorities" in the regula-

tion, thereby leaving the regulation intact with respect to women. True, a classification imposing unequal treatment based upon sex is subject to intermediate rather than to strict scrutiny, *see United States v. Virginia,* 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (classification based upon sex must serve "important government objectives" and must be "substantially related to the achievement of those objectives"), and therefore might survive where the same regulation fails with respect to minorities. Nothing in the rule, however, indicates that the Commission would or sensibly could grant a greater preference to white women than to minority men. On the contrary, when we held in *Lutheran Church* that the Commission's prior EEO rule was unconstitutional with respect to minorities, the Commission suspended the rule with respect to women as well, rather than allow even an interim period in which women but not minorities got preferential treatment. Thereafter the Commission issued the new rule, again treating women and minorities alike. At every turn, therefore, we see the Commission treating women and minorities identically.

In these circumstances, it is clear that severing all references to minorities would severely distort the Commission's program and produce a rule strikingly different from any the Commission has ever considered or promulgated in the lengthy course of these proceedings. Accordingly, we hold that the unconstitutional provisions of the rule cannot be severed and the entire rule must be vacated.

### III. Conclusion

For the reasons stated in the opinion, the Broadcasters' petition for review is granted and the rule is vacated in its entirety. In view of the foregoing, the petition of the UCC is denied as moot.

*So ordered.*