Minority Media and Telecommunications Council, et al., Intervenors.

Nos. 00–1094 & 00–1198.

United States Court of Appeals, District of Columbia Circuit.

Filed June 19, 2001.

## MD/DC/DE BROADCASTERS ASSOCIATION, et al., Petitioners,

v.

## FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.

Before: GINSBURG, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The respondents in this case, the Federal Communications Commission and the United States; one of the petitioners, the United Church of Christ; and the intervenors, the National Organization for Women and the Minority Media and Telecommunications Council, have each petitioned for rehearing. All but MMTC seek rehearing of the court's decision not to sever Option B from the Commission's EEO rule after holding that only that aspect of the challenged rule was unconstitutional. The NOW seeks rehearing of the court's decision not to sever all references in the rule to minorities and thereby leave the rule intact with respect to women. Only the UCC and the Intervenors seek rehearing of the court's underlying conclusion that Option B is unconstitutional.*

---

* Our dissenting colleague argues that the constitutional question, too, merits reconsideration, despite the Commission's decision not to seek rehearing on that issue. In so arguing, the dissent repeatedly claims the Commission's only goal is "broad outreach." As explained in the panel opinion, however, if the Commission's goal were truly broad outreach, then it could measure compliance by looking

The only issue about which the various petitions raise any points that were not fully considered in our prior opinion is the severability of Option B. For the reasons set forth below, we adhere to our original conclusion that Option B is not severable and hence deny the petitions for rehearing.

\* \* \*

■ Before arguing that the panel erred in vacating the entire EEO rule rather than vacating Option B alone, the Commission acknowledges that severance is proper in a case where, as here, the agency has "state[d] its intent [that an unconstitutional portion of a regulation be severed]," only "when such intent is rational, *i.e.,* ... when 'the remainder of the regulation could function sensibly without the stricken provision.'" FCC Pet. for Rehearing at 1 (quoting *MD/DC/DE Broadcasters,* 236 F.3d at 22); *see also K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 294, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988).\* In this case, the court recognized that in the rulemaking proceeding the Commission had expressed its intent as a general preference for severance. *See MD/DC/DE Broadcasters,* 236 F.3d at 22 (citing *Report & Order,* 15 F.C.C.R. 2329, ¶ 232, 2000 WL 124381 (2000) (*R&O*) ("If any provision of the rules ... [is] held to be unlawful, the remaining portions of the rules ... shall remain in effect")). The court concluded, however, that the rule could not, without Option B, sensibly serve the goals for which it was designed.

The Commission marshals three reasons that, in its view, undermine our conclusion. First, citing paragraph 113 of the decision

under review, the Commission argues that it "clearly stated that Option A was sufficient by itself to achieve the Commission's *goals.*" *See* FCC Pet. for Rehearing at 10–11 (emphasis supplied). That, however, is not quite so.

The Commission had two goals in adopting its EEO rule: It sought to "ensur[e] broad outreach [in recruitment] while affording broadcasters flexibility in designing their EEO programs." *R&O* at ¶ 78. In paragraph 113 of the Report and Order, in which the Commission now claims that it "clearly stated" that Option A alone could accomplish both its goals, the Commission actually said this:

> We believe that our *goal* of ensuring that broadcasters engage in broad outreach so that all qualified job candidates are informed of employment opportunities in the industry can be accomplished through compliance with [Option A], without requiring the collection or reporting to the Commission of applicant pool data.... However, if a broadcaster wishes to avail itself of the option of dispensing with the supplemental recruitment measures [prescribed in Option A] and designing its own program [pursuant to Option B], we do not think that it is unreasonable to require it to collect applicant pool data demonstrating that its outreach efforts are inclusive.

*Id.* at ¶ 113 (emphasis added). As can readily be seen, the Commission, despite its present argument to the contrary, did not state — "clearly" or otherwise — that it could achieve both its goals with Option

---

at a broadcaster's outreach efforts rather than — as it does — by collecting data on the race and sex of applicants and investigating any broadcaster producing "few or no" women and minorities in its applicant pools. *See Review of the Commission's Broadcast Equal Employment Opportunity Rules and Policies,* 15 F.C.C.R. 2329, ¶ 120 (2000) (*R&O*). On

remand, of course, the Commission is free to revise its EEO rule to make broad outreach rather than the race and sex of applicants the measure of compliance.

\* The dissent questions the panel's interpretation of *K Mart* and produces a passel of arguments. We address here all the arguments raised in the petitions.

A alone; at most, it stated that it believed it could achieve one of its two goals, namely ensuring broad outreach. It said nothing about the sufficiency of Option A in achieving the Commission's other goal, namely "affording broadcasters flexibility."

■ Second, the Commission argues that in a footnote appended to an order denying reconsideration of the rule it implicitly indicated that Option A could function alone. *See Reconsideration Order,* 15 FCC Rcd. at 22555 n. 19. In that footnote the Commission stated that if the court should hold the data collection requirement in Option B unconstitutional, then only that option should be invalidated. The conclusory statement in the Reconsideration Order, however, says barely more on this issue than does the Report and Order under review. Again, for the Commission to say that it intends that the court sever Option B if necessary is not to say that the court's decision to do so would leave a sensible regulation in place. As we discuss further below, it would not.

■ Third, counsel for the Commission argues that, even if the Commission did not previously make clear that in its view Option A could function sensibly as a freestanding EEO rule, it has done so now in its petition for rehearing. In that petition, Commission counsel unequivocally states that "the Commission would have adopted the remainder of the EEO rule even without Option B." The Federal Communications Commission is a collegial body, however; it speaks through its orders, not through counsel's filings. The dissent points to a press release issued by a single Commissioner in which she refers to the petition for rehearing as an action of "the Commission." The same press release, however, cautions that "Release of the full text of a Commission order constitutes official action." Yet counsel points to no order taking the view espoused in the petition for rehearing. Furthermore, counsel's claim is facially implausible.

■ Recall that in the decision under review, the Commission told us that it had two goals — ensuring broad outreach and affording flexibility. It told us that Option A could satisfy the goal of achieving broad outreach. And it told us that Option B was added in order to afford broadcasters flexibility. For example, in announcing that it would not exempt stations in small markets from EEO obligations, the Commission explained:

> While we believe that small market stations should be granted some relief from EEO requirements ... we believe that such relief is already built into the new broadcast EEO Rule, which affords flexibility to tailor EEO programs to a station's particular circumstances, including market size. For instance, stations in small markets may find that they need fewer recruitment sources to achieve broad outreach than might be the case in larger markets. Also, because stations in smaller markets are likely to attract fewer applicants, they may find [Option B] a less burdensome method of assessing the effectiveness of their outreach.

*R&O* at ¶ 126; *see also id.* at ¶ 104.

Throughout the Report and Order, the Commission repeatedly considered various proposals and evaluated them with respect both to their benefits in promoting outreach and to the effect they would have upon broadcasters' flexibility. *See, e.g., R&O* at ¶ 88 (permitting broadcasters to engage in joint recruiting and noting "there is considerable value in allowing individual broadcasters flexibility"); *id.* at ¶ 95 (rejecting proposal to send notice of openings to all potential sources of job applicants); *id.* at ¶ 97 (granting broadcasters flexibility in selecting form of notice); *id.* at ¶ 110 (expressing desire to

"minimize burdens on broadcasters, especially smaller broadcasters"); *id.* at ¶ 121 (same); *id.* at ¶ 126 (rejecting proposal for relief in light of flexibility afforded to broadcasters, and emphasizing role of Option B to this end); *id.* at ¶ 131 (rejecting proposal for relief in light of flexibility afforded under rule). Thus, Option B played an integral part in the Commission's evaluation of the rule as a whole; indeed, in the entire Report and Order the Commission never once considered the implications of promulgating an EEO rule without Option B — except insofar as it implied that without Option B broadcasters would not have sufficient flexibility.*

Finally, Commission counsel argues that vacating the rule in its entirety will, by forcing the Commission to repromulgate Option A as a new rule, simply cause the Commission expense and delay. Under the Administrative Procedure Act, however, we cannot consider that a drawback. As explained above, in the decision under review the Commission described its two goals and the role that the two options played in effectuating them. In light of that decision, it is clear that severing one of the two options and thereby making the other mandatory would create a rule that the Commission did not consider and which, according to the Commission's own analysis in the course of rulemaking, would not have accomplished the Commission's two goals as it described them. In a renewed rulemaking effort the Commission may adopt other measures to accommodate the concerns it expressed about broadcasters' need for flexibility in general and about the burden Option A would impose upon broadcasters in small markets in particular. Or the Commission may change its goals. Upon the record as it stands, however, retaining Option A without further consideration — and presum-

ably further notice and comment — would leave in force a rule that, in view of the Commission's own stated goals, would be arbitrary and capricious. Accordingly, the petition for rehearing is

*Denied.*

BEFORE: EDWARDS, Chief Judge, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS, TATEL, and GARLAND, Circuit Judges.

## *ORDER*

Petitioner's, respondents', and intervenors' petitions for rehearing en banc and the responses thereto have been circulated to the full court. The taking of a vote was requested. Thereafter, a majority of the judges of the court in regular active service did not vote in favor of the petitions. Upon consideration of the foregoing, it is

ORDERED that the petitions be denied.

Circuit Judge GARLAND did not participate in this matter.

A statement of Circuit Judge TATEL, joined by Chief Judge HARRY T. EDWARDS and Circuit Judge ROGERS, dissenting from the denial of rehearing en banc is attached.

TATEL Circuit Judge, joined by HARRY T. EDWARDS, Chief Judge, and ROGERS, Circuit Judge, dissenting from the denial of rehearing en banc:

"A facial challenge . . . is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). The same principle governs facial challenges to regulations. *See INS v. Nat'l Ctr. for Immigrants' Rights, Inc.,* 502 U.S. 183,

---

* The dissent does not address the Commission's reliance, in denying various exemp-

tions, upon the flexibility provided in the rule as a whole and in particular by Option B.

188, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991). In this case, the panel found that Option B could not be applied without harming white males and therefore declared it facially unconstitutional. Because in so ruling the panel departed from basic principles of judicial restraint—going beyond the record, speculating about how the Commission will enforce the rule and how broadcasters might react, and refusing to defer to the Commission's reasonable interpretation of its own rule—I respectfully dissent from the denial of the three suggestions for rehearing en banc. *See also* FCC Pet. for Reh'g & Suggestion for Reh'g En Banc at 3 ("The limited scope of our rehearing petition . . . should not be misread as reflecting the Commission's agreement with the Court's conclusion that Option B pressures broadcasters to recruit women and minorities in violation of the equal protection component of the Fifth Amendment. The Commission disagrees with the Court's conclusions in that regard and would welcome grant of rehearing on the Court's equal protection analysis.").

I agree with the panel that *Adarand* "requires strict scrutiny only of governmental actions that lead to people being treated unequally on the basis of their race." *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 20 (D.C.Cir.2001). But I do not agree that, on its face, Option B— which is entirely optional—triggers strict scrutiny. Contrary to the panel opinion, Option B merely requires outreach to the entire community, and broadcasters can accomplish such outreach without reducing their recruitment of white males.

"We require," the Commission said of the entire rule, that broadcasters "reach out in recruiting new employees beyond the confines of their circle of business and social contacts to all sectors of their communities." *Review of the Commission's Broadcast Equal Employment Opportunity Rules and Policies*, 15 F.C.C.R. 2329,

¶ 3, 2000 WL 124381 (2000) ("*R&O*"). Broadcasters choosing Option B may "design their own outreach program to suit their needs, as long as they can demonstrate that their program is inclusive, i.e., that it widely disseminates job vacancies through the local community." *Id.* at ¶ 104. The Commission explained further:

> [W]e believe that the objective of ensuring that minority and female applicants have the opportunity to apply for positions . . . may be achieved without a specific requirement that broadcasters in every situation use recruitment methods that specifically target those groups. Outreach that is truly broad and inclusive will necessarily reach minorities and females.

*Id.* at ¶ 77. Moreover, Option B requires submission of racial data only to enable "evaluat[ion of] whether the program is effective in reaching the entire community." *Id.* at ¶ 104. Although "few or no" minority or female applicants "may be one indication . . . that the station's outreach efforts are not reaching the entire community," *id.* at ¶ 120, the Commission emphasized that having few or no female or minority applicants would not be dispositive in its analysis of the adequacy of a broadcaster's recruitment program:

> [T]here is no requirement that the composition of applicant pools be proportionate to the composition of the local workforce. . . . We may ultimately determine that outreach efforts are reasonably designed to reach the entire community, even if few females or minorities actually apply for openings. Conversely, the fact that a sizeable number of females or minorities have applied for openings will not necessarily establish the inclusiveness of the station's efforts. Also, we recognize that

an employer cannot control who applies for jobs.

*Id.*

Broadcasters electing Option B could thus satisfy their obligation simply by undertaking broad, non-racially-targeted recruiting. For example, advertising in a local newspaper read by both minorities and nonminorities could reach "the entire community." *Id.* No record evidence suggests that such advertising would reduce the number of white males receiving job information. Indeed, broad outreach might reach more white males.

Because there exist "circumstances ... under which" broadcasters can comply with Option B with no adverse effect on white males, the broadcasters' facial challenge should have failed. *See Salerno*, 481 U.S. at 745, 107 S.Ct. 2095. The panel should have dismissed their petition, leaving them free to bring an as applied challenge when and if the Commission applies the rule in a discriminatory manner. Instead, misinterpreting Option B and engaging in its own fact-finding, the panel found that Option B would inevitably curtail recruitment of white males, and so subjected it to strict scrutiny.

To avoid the fact that broadcasters could totally ignore Option B, the panel said "the Commission does not argue that Option B creates no pressure to recruit women and minorities because a licensee could always elect Option A." 236 F.3d at 20 n. *. In its Report and Order, however, the Commission stated precisely that:

> [W]e note that the alternative recruitment program is completely optional; any employer who prefers not to collect data concerning the race, ethnicity or gender of its applicants can comply with [Option A's requirements], none of which requires the collection of such data. No broadcaster or cable entity has cause to complain about a program with which it is not required to comply.

*R&O* at ¶ 224. True, the Commission did not make this argument to the panel, but given that the broadcasters challenged the constitutionality of Option A as well as B, it is understandable that the Commission never argued that Option B is not coercive because of the presence of Option A. Although the Commission could have so argued in the alternative, the fact that it didn't still does not justify ignoring the Rule's plain language.

To avoid the fact that nothing on the face of Option B requires that "people be[] treated unequally on the basis of their race," *MD/DC/DE Broadcasters*, 236 F.3d at 20, the panel found that Option B "pressure[s]" broadcasters to "focus their recruiting efforts upon women and minorities, at least until those groups generate a safe proportion of the licensee's job applications." *Id.* at 19–20. According to the panel, this will occur because the Commission, having "life and death power" over broadcasters and "a long history of employing[] 'a variety of *sub silentio* pressures and "raised eyebrow" regulation,' " *id.* at 19 (quoting *Cmty.-Serv. Broad. of Mid–Am., Inc. v. FCC*, 593 F.2d 1102, 1116 (D.C.Cir.1978)), "promises to investigate any licensee that reports 'few or no' applications from women or minorities." *Id.*; *see also* Supplemental Op. at 2 n.*. Licensees, the panel found, "reasonably might (and prudently would) conclude" that the Commission's "focus upon the race and sex of applicants belies its statement ... that its only goal is that licensees recruit with a 'broad outreach.' " *MD/DC/DE Broadcasters*, 236 F.3d at 19. The panel concluded that the Commission "is interested in results, not process, and is determined to get them." *Id.*

The panel's analysis finds no support in the record. The Commission never "promise[d]" to investigate licensees that report few or no applications from women

or minorities. The only record reference to the Commission's investigative priorities is its statement that: "[E]ach year we will randomly select for audit approximately five percent of all licensees.... We *may* also conduct an inquiry if the Commission has evidence of a possible violation of the EEO Rule." *R&O* at ¶ 145 (emphasis added). Moreover, the Commission made clear that, in evaluating a broadcaster's outreach program, it would not view as dispositive the number of women and minorities in the broadcaster's applicant pool. *See supra* at 737–38 (quoting *R&O* at ¶ 120). Because broadcasters could thus accomplish broad outreach without race-targeted recruiting, speculation that some broadcasters, imagining pressure from the Commission or misreading the agency's intentions, might go beyond what Option B requires is no reason to declare it facially unconstitutional. Finally, the panel had no basis for suspecting the Commission's intentions. Not only do the phrases *"sub silentio* pressures" and " 'raised eyebrow' regulation" describe Commission behavior occurring over two decades ago, *see supra* at 739, but nothing in the record of this case indicates that such behavior continues today or that the Commission's goal is anything other than what it declares it to be: broad outreach.

It is possible, as the panel suggested with its own hypothetical, that some broadcasters might redirect recruiting efforts so that "prospective nonminority applicants who would have learned of job opportunities but for the Commission's directive now will be deprived of an opportunity to compete simply because of their race." 236 F.3d at 21. Yet Option B does not require this result, nor does record evidence support the panel's assumption that nonminorities will inevitably receive less job information. Even assuming, as the panel speculated, that recruiting budgets are "fixed in the short run," *id.* at 20 & n. **, there is no reason to believe that broad-

casters would not reallocate recruiting expenditures without depriving nonminorities of job information. Nor does record evidence support the panel's assumption that "even if an employer increases its recruiting budget," it will necessarily use those additional funds for recruiting that is "targeted at minorities." *Id.* at 20 n. **. In fact, the Commission expressly declined to require targeted recruiting. *See supra* at 737 (quoting *R&O* at %% 57 77). Of course, community-wide outreach could mean that white males would face job competition from women and minorities, but not even the panel suggested that this would trigger strict scrutiny.

Determining whether an outreach program crosses the line from expanding opportunities for minorities to disadvantaging nonminorities, thus triggering strict scrutiny—and if so whether the program survives—are difficult issues that neither we nor the Supreme Court has yet considered. We should be especially careful to resolve these important questions on a fully developed record, not on the basis of appellate fact-finding or broadcaster paranoia.

\*　　\*　　\*

The panel's decision that Option B is not severable also warrants en banc review. *See* FCC Pet. for Reh'g & Suggestion for Reh'g En Banc. The decision conflicts with circuit precedent and, like the panel's resolution of the equal protection issue, rests on the panel's rejection of the Commission's reasonable interpretation of its own Rule.

Agency intent has always been the touchstone of our inquiry into whether an invalid portion of a regulation is severable. *See, e.g., Davis County Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C.Cir. 1997); *North Carolina v. FERC*, 730 F.2d 790, 795–96 (D.C.Cir.1984). In this case, the panel acknowledged that "the Commis-

sion clearly intends that the regulation be treated as severable." 236 F.3d at 22 (citing the Commission's statement that "[i]t is our intention ... that, if any provision of the rules ... [is] held to be unlawful, the remaining portions of the rules not deemed unlawful ... shall remain in effect to the fullest extent permitted by law," R&O at ¶ 232). But relying on *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 294, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988), the panel undertook an additional inquiry, asking "whether the remainder of the regulation could function sensibly without the stricken provision." 236 F.3d at 22. Answering no, the panel invalidated the entire Rule. According to the panel, "[t]he core of the rule, by Commission design, is to provide broadcasters with two alternatives," *id.,* a goal unattainable by Option A alone.

*K Mart* concerned a different question than the one presented here. There, the question was whether a *statute's* function would be impaired if, after invalidating a portion of an implementing regulation, the Court left the rest of the regulation in place. 486 U.S. at 294, 108 S.Ct. 1811. Here, the question is whether the Commission's *Rule* can function without Option B. As in the case of any agency interpretation of its own regulation, this is an issue on which we owe the Commission's views special deference. *See Trinity Broad. of Fla., Inc. v. FCC,* 211 F.3d 618, 625 (D.C.Cir. 2000) ("[W]e accord [the Commission's] interpretation of its own regulations a high level of deference, accepting it unless it is plainly wrong.") (internal citation omitted).

Regardless of whether the panel may have had cause to doubt whether Option A alone could have accomplished the Commission's goals, such doubt no longer exists. In its petition for rehearing, the Commission makes it unmistakably clear not only that it "intended Option B to be severable from the remainder of the rule,"

*see* FCC Pet. for Reh'g & Suggestion for Reh'g En Banc at 10, but also that Option A alone can accomplish the agency's "core" goal of ensuring broad outreach. *Id.* at 13. When agencies clarify their intentions regarding severability through petitions for rehearing, we normally correct our opinion and reinstate the valid portions of the regulation. *See Virginia v. EPA,* 116 F.3d 499, 500–01 (D.C.Cir.1997) (reinstating part of a rule in response to EPA's petition for rehearing explaining that the part was severable from sections invalidated in the original panel decision); *Davis County Solid Waste Mgmt.,* 108 F.3d at 1455–56, 1459–60 (same). In this case, however, the panel summarily rejects the Commission's clarification, attributing it to "counsel's" position. *See* Supplemental Op. at 4–5 ("counsel for the Commission argues ... "; "Commission counsel unequivocally states ..."; "counsel's claim"). To the extent the panel is implying that the petition does not reflect the Commission's views and is thus unworthy of deference, that notion is flatly inconsistent with decisions of the Supreme Court and the law of this circuit. In *Auer v. Robbins,* 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), the Supreme Court held that unless a court has "reason to suspect" that an interpretation of a regulation set forth in an agency brief does "not reflect the agency's fair and considered judgment," the agency's interpretation deserves deference. *Id.* at 462, 117 S.Ct. 905; *see also Bigelow v. Dep't of Def.,* 217 F.3d 875, 876, 878 (D.C.Cir.2000) (deferring to an agency interpretation of a regulation set forth for the first time in a brief signed only by a United States Attorney). In this case, we have no basis for suspecting that the rehearing petition does not "reflect the [Commission's] fair and considered judgment." The filing is signed by the Commission's "Acting General Counsel," the Justice Department has told us that it "defer[s] *to the FCC* on the

importance of the severability issue," Resp. to Pets. for Reh'g at 7 (emphasis added), and Commissioner Gloria Tristani, in a press release issued the day the petition was filed, referred to the action of the "Commission." Press Release, Commissioner Gloria Tristani, Re: *MD/DC/DE Broadcasters Ass'n v. FCC* Pet. for Reh'g (Mar. 2, 2001) ("Today, the *FCC* petitioned the D.C. Circuit Court for a partial rehearing of its January 16, 2001, opinion invalidating our EEO outreach rules for broadcasters. While I support the submission as far as it goes, I am disappointed the *Commission* declined to seek review of the entire decision.") (emphasis added).

In addition, the panel has no reason for finding the Commission's position "implausible." Supplemental Op. at 5. Although the panel points to a few paragraphs in the Report and Order suggesting that Option A by itself might provide less flexibility than Options A and B together, there is enough flexibility in Option A alone to demonstrate that the Commission's statement that it would have promulgated Option A by itself is not "plainly wrong." *Trinity Broad.*, 211 F.3d at 625. The thirteen program choices within Option A, the Commission explained, avoided "inflexible requirements" and "enable[d] broadcasters to select the approaches that they believe will be most effective in their situations." *R&O* at ¶ 100. The Commission, moreover, emphasized that Option A would independently meet its outreach goals. *See id.* at ¶ 113. According to the Commission, it reluctantly included Option B in response to broadcasters' urging: "We are *willing* to allow broadcasters to forego the supplemental recruitment measures [of Option A] and to design their own outreach program to suit their needs, as long as they can demonstrate that their program is inclusive, i.e., that it widely disseminates job vacancies throughout the local community." *Id.* at ¶ 104 (emphasis added). As the Commission argues, the

"core of the rule" is Option A. *See* FCC Pet. for Reh'g & Suggestion for Reh'g En Banc at 13.

There is, in other words, no "substantial doubt" that the Commission would have adopted Option A "on its own." *See Davis County Solid Waste Mgmt.*, 108 F.3d at 1459. In reaching a different conclusion, the panel improperly substituted its own views for the Commission's.